IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

NATHAN SECKER,

        Plaintiff,

v.                                  Case No. 3:24-cv-00630

EPIC SYSTEMS CORPORATION,

        Defendant.

## ANSWER AND AFFIRMATIVE AND OTHER DEFENSES

Now comes, Defendant, Epic Systems Corporation, by its attorneys, Michael Best & Friedrich LLP and hereby answers Plaintiff's Complaint as follows:

1.      In August of 2019, Mr. Nathan Secker ("**Plaintiff**" or "**Mr. Secker**") started working for Epic Systems Corporation ("**Epic**" or "**Defendant**") as a Project Manager on the Continuing Care Clinicals team.

**ANSWER**: Admits.

2.      In response to the pandemic, Defendant implemented a telework program to mitigate risks related to the COVID-19 pandemic.

**ANSWER**: Denies.

3.      In August of 2021, Defendant announced a mandatory COVID-19 Vaccination Mandate Policy (the "**Mandate**").

**ANSWER**: Admits.

4.      Defendant required that employees become fully vaccinated by October 1, 2021, as a condition of continued employment.

**ANSWER**: Admits that absent a reasonable accommodation for religious or disability reasons, employees were generally required to become fully vaccinated by October 1, 2021, as a condition of continued employment.

5. Understanding that his religious beliefs and practices in conflict with vaccination were entitled to legal protection under Title VII and the WFEA, Mr. Secker submitted his religious accommodation request to the Mandate on August 9, 2021.

**ANSWER**: Admits that Mr. Secker requested an accommodation and admits that Title VII and the WFEA require an employer to reasonably accommodate the religious practices of an employee unless doing would create an "undue hardship" on the employer but denies the remainder of the allegations in paragraph 5.

6. On August 23, 2021, Defendant denied Mr. Secker's accommodation request, citing a purported undue hardship. Defendant first validated that Mr. Secker possessed a sincere religious conflict with vaccination that triggered legal protection, and the company's accompanying duty to accommodate short of undue hardship. In fact, the company validated in writing that Mr. Secker was entitled to Title VII protections before terminating him based on pretextual rationales.

**ANSWER**: Admits that Epic denied Mr. Secker's accommodation request due to undue hardship on August 23, 201 but denies the remaining allegations of paragraph 6.

7. Epic's undue hardship excuse was less than credible. Mr. Secker was working almost 100% remotely during the relevant time frames, and he could have continued to seamlessly fulfill his job roles exceptionally well, as he had done throughout the pandemic while unvaccinated. When required to make periodic visits to customer sites, Mr. Secker could have seamlessly performed his job through, inter alia: (1) providing proof of a negative COVID-19 test before traveling onsite; (2) Epic could have recognized the scientific reality of his natural immunity against COVID-19 as an accommodation option; (3) Epic could have allowed for a vaccinated colleague to travel in his place when servicing a customer that required vaccination for entry; (4) Epic could have switched Mr. Secker to another department that did not require travel but still allowed him to perform the same role; or (5) any combination of the above options.

**ANSWER**:  Denies.

8.     After pretextually rejecting Mr. Secker's accommodation request on undue hardship grounds, Defendant notified Mr. Secker that he would have until October 1, 2021, to comply with the Mandate.

**ANSWER**:  Admits that Epic notified Mr. Secker that he would have until October 1, 2021, to comply with its Vaccination policy, but denies the remaining allegations of paragraph 8.

9.     On August 30, 2021, Mr. Secker notified Human Resources ("**HR**") that he would not be complying with the Mandate due to his religious conflict.

**ANSWER**:  Admits.

10.    On September 30, 2021, Defendant terminated Mr. Secker for noncompliance with the Mandate.

**ANSWER**:  Admits.

11.    Under controlling standards, Defendant's undue hardship justification for Mr. Secker's termination fails. Mr. Secker could have been accommodated without any hardship whatsoever, and Defendant, therefore, cannot show that it would have been a "substantial burden" or expense to have accommodated Mr. Secker's religious beliefs. *See Groff v. DeJoy*, 600 U.S. 447, 470 (2023) (holding that, under Title VII, employers must accommodate their employee's religious beliefs short of "substantial burden" or expense when viewed in light of the particular businesses' capabilities to accommodate).

**ANSWER**:  Paragraph 11 states a legal conclusion for which no response is required. To the extent a response is required, denies.

12.    Defendant violated Title VII (42 U.S.C. § 2000e-2 *et. seq*) and Wisconsin law by failing to engage in a good faith interactive process to determine if a reasonable accommodation existed for Mr. Secker, failing to provide any of the available low-cost and no-cost reasonable accommodations to Mr. Secker, and engaging in religious discrimination by treating similarly situated, secular employees more favorably than Mr. Secker.

**ANSWER**:   Paragraph 12 states a legal conclusion for which no response is required. To the extent a response is required, denies.

13.     Accordingly, Mr. Secker seeks damages, including back pay, front pay, liquidated damages, punitive damages, lost benefits, compensatory damages, damages for emotional distress, pain and suffering, punitive damages, and reasonable attorneys' fees and costs, declaratory relief, injunctive relief, as well as any other relief to which he is entitled.

**ANSWER**:   Paragraph 13 states a legal conclusion for which no response is required. To the extent a response is required, denies.

## PARTIES

14.     For the duration of his employment with Epic, Plaintiff lived and worked from Fitchburg, Wisconsin.

**ANSWER**:  Epic lacks sufficient information to form a belief as to where Plaintiff lived during the duration of his employment with Epic, and therefore denies same and denies the remaining allegations of paragraph 14.

15.     Defendant Epic Systems Corporation is a Wisconsin for-profit corporation with its principal place of business in Verona, Wisconsin.

**ANSWER**:  Admits.

## JURISDICTION AND VENUE

16.     This Court has original jurisdiction of this civil action as one arising under the laws of the United States. *See* 28 USC §1331. This Court has jurisdiction over the subject matter of this civil action pursuant to Title VII.

**ANSWER**:  Epic admits that the Court has jurisdiction over the subject matter of this action.

17.     Venue is proper in the Court under 42 USC § 2000e-5(f)(3) because the "unlawful employment practices" giving rise to this lawsuit took place within this district and the "employment records relevant to such practice" are

4

maintained and administered in this District. Additionally, but for Defendant's unlawful actions, Mr. Secker would have continued working in this District. 42 USC § 2000e-5(f)(3).

**ANSWER**:   Paragraph 17 states a legal conclusion for which no response is required. To the extent a response is required, admits that venue is proper and that employment records relevant to this action are located and administered in this District, but denies the remaining allegations of paragraph 17.

## FACTUAL ALLEGATIONS

18.     In March 2020, the SARS-CoV-2 virus prompted the institution of worldwide lockdowns and limitations on in-person interaction to slow the spread of the disease now known as COVID-19.

**ANSWER**:  Admits.

19.     On March 13, 2020, then President Donald J. Trump declared a national emergency relating to the COVID-19 pandemic. In response, many state and local governments issued "Stay at Home" orders for all non-essential workers, urging residents only to leave their homes for necessities. This resulted in corporations, like Epic, shifting all non-essential workers to remote work and utilizing teleconferencing platforms like Zoom as replacements for in-person meetings.

**ANSWER**:   Epic admits the first and second sentences but denies the third sentence of paragraph 19.

20.     Mr. Secker started working for Epic as a Project Manager in August of 2019 on the Continuing Care Clinicals team. Mr. Secker's core function was to lead teams for Epic software installation at various medical facilities. Mr. Secker mainly traveled between three major customer sites, none of which required vaccination for entry. Notably, Mr. Secker primarily worked in the Information Technology ("**IT**") sectors of these medical facilities and had virtually no contact with patients or staff.

**ANSWER**:  Admits that Mr. Secker started working for Epic as a Project Manager in August of 2019 on the Continuing Care Clinicals team and that a core function of his

5

job was to lead teams for Epic software installation at various medical facilities. Epic

denies the remaining allegations of paragraph 20.

21.     During the height of the pandemic, Mr. Secker ceased traveling to customer sites and shifted to a remote work model. Mr. Secker successfully performed his role virtually for roughly eight months preceding his termination without issue. While working remotely, he performed exceptionally well. Notably, due to his strong performance, Mr. Secker received a 25% merit increase in July of 2021, and a change in title to Application Manager, approximately one month before Defendant announced the Mandate.

**ANSWER**:  Epic admits that at a point during the pandemic, Mr. Secker

temporarily ceased traveling to customer sites. Epic denies the remainder of the

allegations in paragraph 21.

22.     Although Mr. Secker's role previously required limited travel to client sites to assist with integrations, his travel to customer sites decreased dramatically during the pandemic.

**ANSWER**:  Denies.

23.     Regardless of his vaccination status, during the pandemic, Mr. Secker was still permitted to travel to client sites on the rare occasions Defendant instructed him to do so. In July of 2021, exactly one month before the Mandate, Epic sent Mr. Secker to a colleague's (another Project Manager) client site to assist Epic on an integration. Epic had no issue allowing Mr. Secker to travel when it needed a Project Manager present for that particular client site.

**ANSWER**:  Epic admits that Mr. Secker traveled to customer locations in 2021 but

denies the remainder of the allegations in paragraph 23.

24.     In August of 2021, Epic announced the Mandate. Soon thereafter, at a time it knew its vaccinated employees were contracting COVID-19 at high rates, Epic also announced that it would be shifting remote employees back onsite gradually (undercutting its workplace safety rationale).  During this time, however, Epic also continued to liberally allow remote work.

**ANSWER**:  Epic admits the first sentence but denies the remainder of the allegations in paragraph 24.

25.     Epic's stated reasoning for implementing the Mandate was due to purported "workplace safety."

**ANSWER**:  Admits that Epic implemented a vaccination requirement for, amongst other reasons, (including the expectations and requirements of its customers and current or anticipated legal requirements) workplace safety, but denies the remaining allegations of paragraph 25.

26.     However, during this time, Defendant possessed actual and/or constructive knowledge that the mandated vaccines were neither safe, nor effective. In fact, Defendant's records will show its vaccinated employees were contracting COVID-19 at similar or higher rates than unvaccinated religious employees, like Plaintiff, during the relevant time frames.

**ANSWER**:  Denies.

27.     This reality is consistent with research from one of the world's most prestigious medical institutions-the Cleveland Clinic, which has found that the risk of contracting COVID-19 **increases** with the number of vaccine doses received.

**ANSWER**:  Denies.

28.     Regardless of its contemporaneous knowledge that COVID-19 vaccines were ineffective at preventing the transmission and infection of COVID-19, Defendant implemented and maintained the Mandate as a condition of continued employment against employees it knew were unable to comply for religious reasons, knowing that the mandated medical procedure was at best a personal protection device.

**ANSWER**:  Epic admits that it implemented the Mandate but denies the remainder of the allegations in paragraph 28.

29.     Defendant also knew or should have known that the mandated vaccines were not "safe" by any reasonable measure.

**ANSWER**: Denies.

30.     Despite actual and/or constructive knowledge of adverse events related to the COVID-19 vaccines, readily available after Plaintiff and those similarly situated submitted religious exemption requests, Defendant required that religious employees submit to vaccination as a condition of employment, justifying the violation of their religious integrity on provably false justifications that the mandated vaccines were "effective" and therefore, that workplace safety demanded they discard their religious beliefs.

**ANSWER**: Denies.

31.     Despite clearly stated religious reasons for declining vaccination, Defendant—in reckless disregard of Plaintiff's Title VII rights—insisted that Plaintiff abandon his religious beliefs in exchange for personal protection.

**ANSWER**: Denies.

32.     The mandated vaccines do not prevent transmission or infection. At best, the mandated vaccines provided an undefined level of personal protection, a benefit Plaintiff gladly declined to preserve his religious integrity. However, the mandated vaccines have documented risks, risks that Defendant required Plaintiff to expose himself to as a condition of employment, with full knowledge Plaintiff was unable to become vaccinated for religious reasons.

**ANSWER**: Denies.

33.     Despite these known risks, Epic advertised the vaccines as "safe" and "effective", requiring religious employees like Mr. Secker to violate their religious beliefs based on counterfactual rationales.

**ANSWER**: Denies.

34.     Epic possessed actual and/or constructive knowledge during the relevant time frames through publicly available information and reports from its own employees that its safety and efficacy advertisements were provably false.

**ANSWER**: Denies.

35.     The Mandate allowed employees to request a medical or religious accommodation.

**ANSWER**: Admits.

36.    Mr. Secker timely submitted his Form on August 9, 2021, prior to Epic's stated deadline, containing a detailed explanation of his sincere religious beliefs precluding him from.

**ANSWER**:  Epic objects to paragraph 36 as unintelligible but admits that Mr. Secker submitted a religious accommodation request form on August 9, 2021, prior to the stated deadline and the form contained an explanation of his religious beliefs. Epic denies the remaining allegations of paragraph 36.

37.    Mr. Secker's sincere religious beliefs are rooted in his Christian beliefs. His religious accommodation request clearly articulates how his beliefs conflicted with receipt of any of then-available COVID-19 vaccines.

**ANSWER**:  Denies.

38.    In his request, Mr. Secker presented multiple religious objections to the Mandate. First, Mr. Secker believes that the COVID-19 vaccine is tied to the mark of the beast mentioned in the Book of Revelations in the Bible. As such, if he were to receive a COVID-19 vaccine, Mr. Secker believes he would be eternally condemned. Second, Mr. Secker views abortion as a sin in his religious system of beliefs and objects to receipt of medical products that were designed, developed, and/or tested using aborted fetal cell lines. Mr. Secker realizes that a COVID-19 vaccine may provide a personal benefit, but he cannot receive such a benefit as it would require participation in the taking of an innocent human life, which to him, is a sin that would potentially subject him to eternal judgment. It is and was Mr. Secker's understanding that the COVID-19 vaccines were all designed, developed, and/or tested with aborted fetal cell lines. Third, Mr. Secker believes that his body is a Temple of the Holy Spirit and, therefore, he must safeguard his body against anything that may "contaminate" and "defile" his spiritual and physical body, which, in his personal system of religious beliefs, would include injecting a COVID-19 vaccine.

**ANSWER**:  Epic admits that Mr. Secker submitted initial and amended religious accommodation request forms, and affirmatively states that such forms speak for themselves. Epic lacks sufficient information to form a belief as to the truth of the remainder of the allegations in paragraph 38 and therefore denies same.

9

39.     Mr. Secker was not willing to discard these religious beliefs in exchange for preserving his career.

**ANSWER**:  Epic lacks sufficient information to form a belief as to the truth of the allegations in paragraph 39 and therefore denies same.

40.     Epic validated the religious sincerity of Mr. Secker's religious conflict with vaccination, yet failed to evaluate in good faith whether it could accommodate his religious beliefs short of undue hardship, consistent with Title VII and the WFEA's requirements.

**ANSWER**:  Denies.

41.     On August 23, 2021, Ms. Gaby Merkes ("**Ms. Merkes**") of Human Resources contacted Mr. Secker via phone and notified him that Epic would be unable to accommodate him short of undue hardship, purportedly due to the nature of his role, and afforded him until October 1, 2021, to reconsider whether he would violate his religious integrity and submit to vaccination; otherwise, he would be terminated.

**ANSWER**:  Admits that on August 23, 2021, a member of Human Resources notified Mr. Secker via phone that Epic would not be able accommodate him due to the nature of his role and afforded him until October 1, 2021 to obtain a vaccination, transfer to a different position or suggest an alternative reasonable accommodation. Epic denies the remaining allegations of paragraph 41.

42.     On August 30, 2021, Mr. Secker emailed Ms. Merkes, notifying her that after careful consideration, he could not in good conscience abandon his religious beliefs by complying with vaccination.  Ms. Merkes replied to Mr. Secker, notifying him that they would commence his departure procedures.

**ANSWER**:  Epic admits that Mr. Secker emailed Erin McWilliams on August 30, 2021, and that Ms. McWilliams responded on the same date regarding his decision to not be vaccinated, and affirmatively states that the emails speak for themselves. Epic denies the remaining allegations of paragraph 42.

10

43.     On September 8, 2021, Mr. Secker emailed Erin McWilliams ("**Ms. McWilliams**") to seek further clarification on his termination. Epic, at this time, pretextually attempted to frame Mr. Secker's termination as a voluntary departure (a provably false position). It was abundantly clear that Mr. Secker wanted to remain in his job and simultaneously preserve his religious convictions, and, as such, he requested that Epic consider accommodating him through regular testing, masking, limiting travel, remote work, or in the alternative, transfer him to an alternative role that did not require vaccination.

**ANSWER**:   Epic admits that Mr. Secker and Erin McWilliams exchanged additional emails between September 8 and 13, 2021, and affirmatively states that the emails speak for themselves. Epic denies the remainder of the allegations in paragraph 43.

44.     On September 13, 2021, Mr. Secker received an email from Ms. McWilliams reaffirming that although "Epic absolutely appreciates and respects the religious beliefs" Mr. Secker had detailed to Epic, it was refusing to offer an accommodation option that would enable him to preserve his current job role.

**ANSWER**: Admits that on September 14, 2021, Mr. Secker received an e-mail from Ms. McWilliams which included the statement that "Epic absolutely appreciates and respects the religious beliefs you've shared" and affirmatively states that the email speaks for itself. Epic denies the remainder of the allegations in paragraph 44.

45.     Epic maintained the fiction that accommodating Mr. Secker would constitute an undue burden, despite that Mr. Secker had shared a non-exhaustive list of low-cost and no-cost accommodation options.

**ANSWER**: Denies.

46.     Epic refused to engage in a good faith dialogue to identify an accommodation option that would have permitted Mr. Secker to maintain his successful career, and instead suggested that he apply for a substantial demotion within the company, and other jobs Mr. Secker was not experienced in and would not be eligible for in any event.

**ANSWER**: Denies.

47.     Ms. McWilliams never specifically addressed any of Mr. Secker's suggested accommodation options, which would have been low-cost or virtually no-cost solutions to allow Mr. Secker to continue in his then current role, without abandoning his sincerely held beliefs.

**ANSWER**: Denies.

48.     Critically, free testing, which is a more effective COVID-19 countermeasure than vaccination (because it is capable of preventing transmission, unlike vaccination) was available for free across the country during the relevant time frames, including in areas where Mr. Secker worked from.

**ANSWER**: Denies.

49.     On September 15, 2021, Mr. Secker sent a follow up email to Ms. McWilliams inquiring on which of his customers strictly required full vaccination for entry on site. Ms. McWilliams responded with the following hypothetical scenario:

> The number of customers that are requiring vaccination continues to change and grow. Ultimately the majority or even all of Epic's customers—who are at the forefront of the COVID response given their role in healthcare—will have this requirement.
>
> I don't mean to be redundant, but I want to be sure I'm abundantly clear. Your role at Epic requires you to be available to travel and work with ANY one of our customers – not based on those customers' vaccination requirements (and that assumes they don't all require onsite visitors to be vaccinated, which won't necessarily be the case given the increasing numbers that are requiring vaccines every day, and new updates announced by President Biden last week).

**ANSWER**:   Admits that Mr. Secker sent an e-mail to Ms. McWilliams on September 14, 2021, that asked multiple questions, including, "Which/how many customers have explicitly said that they will not allow staff with accommodations to travel onsite?" and that Ms. McWilliams' September 15, 2021 response includes the text

quoted in paragraph 49. Denies the remaining allegations of paragraph 49, including that

Ms. McWilliams response was "hypothetical."

50.     Epic never showed what clients or potential clients required proof of vaccination for Mr. Secker to potentially enter their premises. Thus, Epic's justification for his termination was based on a hypothetical situation, not reality.

**ANSWER**: Denies.

51.     In addition to being hypothetical, Ms. McWilliams' communication was also nonsensical relative to Epic's prior actions. Epic had just weeks before instructed Mr. Secker to travel onsite to another Project Manager's customer one month prior to the institution of its Mandate. Clearly Epic did not perceive Mr. Secker's vaccination status as a threat before terminating his employment based on workplace safety justifications (during the heights of the pandemic while vaccines were readily available).

**ANSWER**: Denies.

52.     Epic also never inquired with its customers whether they required vaccination for entry. Even if the company had, and even if such customers/clients did in fact have vaccination mandates for members of the general public or for business partners, Mr. Secker still could have been easily accommodated without any hardship whatsoever.

**ANSWER**: Denies.

53.     Defendant refused to offer a single accommodation to Mr. Secker that would have permitted him to continue his role and simultaneously preserve his religious convictions in conflict with vaccination.

**ANSWER**: Denies.

54.     On belief, Defendant granted accommodations to similarly situated peers who had just as much, if not more, in-person contact than Mr. Secker.

**ANSWER**: Denies.

55.     Defendant could have easily accommodated Mr. Secker without any undue hardship to the company by simply maintaining the status quo of remote work.

**ANSWER**:  Denies.

56.    On belief, Defendant granted various accommodations in a similar fashion, allowing similarly situated employees the option of remote work, regular testing, masking, etc., as an accommodation.

**ANSWER**:  Denies.

57.    Defendant pretextually asserted that Mr. Secker must be vaccinated as his job required significant in-person interface and frequent travel.

**ANSWER**:  Denies.

58.    However, Mr. Secker's role did not require daily travel to sites. In fact, when the Mandate was implemented, Mr. Secker was not even scheduled to tentatively travel until February of 2022.

**ANSWER**:  Denies.

59.    Further, in the rare event Mr. Secker may have needed to travel to a physical location, there were accommodation options that were more effective than vaccination. Specifically, regular testing, which was a no-cost/low-cost option.

**ANSWER**:  Denies.

60.    Regular testing is a more effective COVID-19 countermeasure as one does not transmit the virus when one is not infected, while vaccination does not provide that same guarantee.

**ANSWER**:  Denies.

61.    In fact, vaccinated individuals are more likely to spread COVID-19 due to asymptomatic infection, which judicially noticeable sources and expert testimony will validate.

**ANSWER**:  Denies.

62.    Additionally, recognizing Mr. Secker's natural immunity was a no-cost accommodation option Defendant likewise refused to consider or offer.

**ANSWER**:  Denies.

63.     Critically, natural immunity against COVID-19 is equally, if not more, effective than vaccination.

**ANSWER**: Denies.

64.     Mr. Secker contracted and recovered from COVID-19 in August of 2021.  Mr. Secker notified Defendant that he had recovered from COVID-19 and placed the company on actual notices of his natural immunity against COVID-19.

**ANSWER**: Denies.

65.     Defendant knew or should have known that Mr. Secker had been immunized naturally and, therefore, possessed equal or superior protection against the virus relative to vaccine-induced immunity.

**ANSWER**: Denies.

66.     Because of his natural immunity, Defendant cannot reasonably argue that Mr. Secker posed a greater threat to any person's safety than did its vaccinated employees.

**ANSWER**: Denies.

67.     Because of its specialized experience and knowledge in the pharmaceutical space, Defendant fully understands the concept of immunization through prior infection, and that natural immunity is universally recognized as *at least equivalent* to immunity derived from vaccination alone.

**ANSWER**: Denies.

68.     Centuries of scientific consensus demonstrate that recovery from viral infection results in natural immunity, a form of protection that vaccines attempt to artificially emulate.

**ANSWER**: Denies.

69.     The international scientific community has conclusively established through centuries of research that natural immunity is superior to vaccine-elicited immunity.

**ANSWER**: Denies.

70.     Dr. Anthony Fauci has stated that prior infection is the most effective means of immunization.

**ANSWER**: Denies.

71.     The Center for Disease Control ("**CDC**") has documented that natural immunity provides strong and durable protection against COVID-19.

**ANSWER**: Denies.

72.     In the context of COVID-19, natural immunity's desirable relative efficacy has been repeatedly confirmed in the scientific literature.

**ANSWER**: Denies.

73.     The company's own business records will demonstrate that its vaccinated employees were contracting COVID-19 at unacceptably high rates during the relevant time frames, likely at even higher rates than its unvaccinated religious employees, who, like Mr. Secker, had been immunized naturally.

**ANSWER**: Denies.

74.     Weeks before Defendant instituted the Mandate, the CDC, other federal health agencies, and the international research community repeatedly confirmed that the COVID-19 vaccines did not prevent transmission or infection.

**ANSWER**: Denies.

75.     On August 6, 2021, the CDC recognized that the COVID-19 vaccines worked "with regard to severe illness and death… [b]ut what they c[ouldn]'t do anymore is prevent transmission."  Statement by Rochelle Walensky, U.S. Centers for Disease Control, CNN Interview (Aug. 5, 2021).

**ANSWER**:  Epic lacks knowledge or information sufficient to form a belief as to the truth of the matter asserted, and therefore denies same, further states that the alleged interview speaks for itself.

76.     When terminating Mr. Secker, Defendant knew or should have known that the COVID-19 vaccines were ineffective at stopping transmission and infection and, at best, provided an undefined level of personal protection.

16

**ANSWER**:  Denies.

77.     Despite knowing of the COVID-19 vaccines' inefficacy, and the relative strength of natural immunity, Defendant refused to accommodate employees with religious conflicts to the Mandate through recognizing their natural immunity as an accommodation option, and irrationally and without lawful justification, insisted that naturally immune religious employees like Mr. Secker violate their religious beliefs as a term and condition of employment when it knew such employees had already been immunized.

**ANSWER**:  Denies.

78.     Additional accommodation options were available in the event Mr. Secker was required to travel and interact in person, an unshown event, that a third party would require Mr. Secker to show proof of vaccination to perform his job and that Mr. Secker was definitely going to be required to travel to that third party's worksite in furtherance of his job. Specifically, Defendant could have also offered voluntary schedule swapping as an accommodation option.

**ANSWER**:  Denies.

79.     Plenty of vaccinated individuals on Mr. Secker's team were capable and willing to take his place in such an unshown occasion, and Mr. Secker would have gladly done a voluntary schedule swap with such an employee in this unshown event.

**ANSWER**:  Denies.

80.     Further, none of Mr. Secker's clients actually required him to be vaccinated for entry on site, which Mr. Secker explicitly advised Defendant of. This was evident when Mr. Secker started a new role after his termination with Epic and serviced the same clients without being vaccinated.

**ANSWER**:  Epic lacks knowledge or information sufficient to form a belief as to the truth of the matter asserted, and therefore denies same.

81.     Notably, Mr. Secker's biggest customer, Atrium Health, provided religious accommodations to its employees. In fact, Mr. Secker's customer contact for Atrium, Laura Tibert, explicitly told him that she herself was unvaccinated, and that she was granted a religious accommodation.

**ANSWER**:  Epic lacks knowledge or information sufficient to form a belief as to the truth of the matter asserted, and therefore denies same.

82.   Defendant pretextually asserted that Mr. Secker must be vaccinated as his job required significant in-person interface and frequent travel, inferring that parties other than Epic were requiring proof of vaccination. Yet Defendant on multiple occasions admitted that it was unaware of which particular customers required proof of vaccination to enter their premises.

**ANSWER**: Denies.

83.   Mr. Secker's role did not require daily travel to sites. In fact, when the Mandate was implemented, Mr. Secker was not scheduled to travel until February of 2022.

**ANSWER**: Denies.

84.   Epic intentionally refused to inquire whether Mr. Secker's clients required vaccination to enter their worksites, because if it had, the company would have discovered that its concerns were non-existent, and that Mr. Secker could have been accommodated without any burden whatsoever.

**ANSWER**: Denies.

85.   Mr. Secker performed above expectations while unvaccinated and working remotely, with no hinderance on performance, for the duration of his time with Defendant and throughout the relevant time frames. This was evident by his 25% merit increase received during the height of the pandemic for the exceptional work he had performed while unvaccinated.

**ANSWER**: Denies.

86.   On belief, Defendant accommodated similarly situated, non-religious employees who had medical conflicts with the Mandate, demonstrating its ability to accommodate short of undue hardship.  These similarly situated, non-religious employees were accommodated via telework, testing, masking, or some other type of enhanced safety protocols.

**ANSWER**: Denies.

87. Defendant failed to engage in a good-faith interactive process to consider possible reasonable accommodations for Mr. Secker that would not cause Defendant an undue burden.

**ANSWER**: Denies.

88. Defendant could have accommodated Mr. Secker without undue hardship through, inter alia, (1) maintaining the status quo of telework; (2) acknowledging his documented natural immunity; (3) weekly testing (which was available for free throughout the country during the relevant time frames and was a more effective COVID-19 countermeasure ); (4) enhanced safety protocols; (5) voluntary schedule swapping in the rare event that Mr. Secker would have had to interact in person and any purported risks posed by such in-person meetings could not be mitigated through recognition of natural immunity, testing, enhanced safety protocols, etc., or (6) any combination of the above options.

**ANSWER**: Denies.

89. Regardless of these glaringly obvious options, Epic terminated Mr. Secker on September 30, 2021, pretextually citing undue hardship.

**ANSWER**: Admits that Epic terminated Mr. Secker's employment on September

30, 2021. Denies the remaining allegations of paragraph 89.

90. On October 28, 2021, Mr. Secker filed his initial Charge of Discrimination with the Wisconsin Equal Rights Division ("**WERD**") alleging religious discrimination.

**ANSWER**: Admits.

91. The WERD operates under a work sharing agreement with the EEOC. As such any charge filed with the WERD is considered dually filed with the Equal Employment Opportunity Commission ("**EEOC**").

**ANSWER**: Admits.

92. After his termination, Mr. Secker experienced and is experiencing pronounced stress and anxiety related to the loss of his Epic career.

**ANSWER**: Epic lacks knowledge or information sufficient to form a belief as to

the truth of the matter asserted, and therefore denies same.

93. On June 17, 2024, the EEOC concluded its investigation and issued a Notice of Right to Sue on behalf of Mr. Secker.

**ANSWER**: Admits that on June 17, 2024, the EEOC issues a "Determination and Notice of Rights" which states, in part, "This is official notice from the EEOC of the dismissal of your charge and of your right to sue" within 90 days of Secker's receipt of the notice.

## CAUSES OF ACTION

### COUNT ONE
### TITLE VII RELIGIOUS DISCRIMINATION – FAILURE TO ACCOMMODATE
### U.S.C. § 2000e-2(a)(1))

94. Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

**ANSWER**: Epic incorporates by reference its responses to the foregoing paragraphs of this Complaint as is fully set forth herein.

95. Defendant violated Title VII by refusing to accommodate Mr. Secker's religious beliefs in conflict with the Mandate when there were many low-cost and no-cost accommodation options available.

**ANSWER**: Denies.

96. To establish a prima facie claim for failure to accommodate, a plaintiff must present threshold evidence to show: (1) the observance, practice, or belief conflicting with an employment requirement is religious in nature; (2) the employee called the religious observance, practice, or belief to the employer's attention; and (3) the religious observance, practice, or belief was the basis for the employee's discriminatory treatment. *Passarella v. Aspirus, Inc.*, 108 F.4th 1005, 1009 (7th Cir. 2024).

**ANSWER**: Paragraph 96 states a legal conclusion for which no response is required. To the extent a response is required, admits.

97.     Once a prima facie case is established, the burden shifts to the employer to demonstrate that it cannot reasonably accommodate an employee's religious beliefs without undue hardship on the conduct of the employer's business. *Id.*

**ANSWER**:   Paragraph 97 states a legal conclusion for which no response is required. To the extent a response is required, admits.

98.     The Supreme Court's recent ruling in *Groff* makes clear that employers have an affirmative duty to accommodate an employee's religious beliefs unless doing so "would result in substantial increased costs in relation to the conduct of its particular business." *Groff*, 600 U.S. at 470.

**ANSWER**:   Paragraph 97 states a legal conclusion for which no response is required. To the extent a response is required, denies.

99.     Mr. Secker possesses sincere religious beliefs that preclude him from receiving a COVID-19 vaccine, and placed Epic on notice of this conflict when he submitted his request for a religious accommodation.

**ANSWER**:   Epic admits that Mr. Secker submitted a request for a religious accommodation, but as to the remainder of the allegations in paragraph 99, Epic lacks knowledge or information sufficient to form a belief as to the truth of the matters asserted, and therefore denies same.

100.    The Supreme Court has repeatedly cautioned courts to be especially careful about questioning the sincerity of a citizen's religious beliefs. *See, e.g., United States v. Seeger*, 380 U.S. 163, 185 (1965) (courts should not inquire into the validity or plausibility of a person's beliefs; instead, the task is to determine whether "the beliefs professed are sincerely held and whether they are, in [a believer's] own scheme of things, religious.").

**ANSWER**:   Paragraph 100 states a legal conclusion for which no response is required. To the extent a response is required, denies.

101.    The Seventh Circuit has paid careful attention to the Supreme Court's directives in the Title VII context. *See, e.g., Adeyeye v. Heartland Sweeteners*, LLC, 721 F.3d 444, 453 (7th Cir. 2013) (holding that courts are ill-suited to assess

21

religious sincerity, and therefore the law must "tread lightly" when assessing whether an employee has a bona fide religious conflict); *Passarella,* 108 F.4th at 1010 (in Title VII vaccination mandate context, observing that "the Supreme Court has admonished courts in no uncertain terms not to enter when discerning whether an individual harbors a religious belief or engages in religious practice ").

**ANSWER**:   Paragraph 101 states a legal conclusion for which no response is required. To the extent a response is required, denies.

102.     In the Title VII context, the term "religion" covers "all aspects" of an employee's religious observance, practice, and belief." *Id.* at 1009 (cleaned up).

**ANSWER**:   Paragraph 102 states a legal conclusion for which no response is required. To the extent a response is required, admits.

103.     Mr. Secker's sincerely held religious beliefs are deeply rooted in his Christian faith.  In his exemption request, Mr. Secker cited several separate and distinct beliefs, tenants, and practices of his personal religious beliefs in conflict with Epic's Mandate.

**ANSWER**:  Epic lacks sufficient information to form a belief as to the truth of the allegations in paragraph 103 and therefore denies same.

104.     First, Mr. Secker believes that the COVID-19 vaccine "aligns with the mark of the beast" and that receiving a COVID-19 vaccine would be rejecting God. Second, Mr. Secker believes that life begins at conception and, therefore, he rejects any medical product that was tested or developed through the use of aborted fetal cell lines because accepting same would be a sin (which, as he understands it, is the case with all the COVID-19 vaccines that Epic mandated). Third, on separate and distinct grounds, Mr. Secker also believes that his body is a Temple of God, created perfect in his image and, therefore, Mr. Secker must safeguard his body by refraining from injecting substances that would defile or contaminate his spiritual and physical body.

**ANSWER**:  Epic lacks sufficient information to form a belief as to the truth of the allegations in paragraph 104 and therefore denies same.

105.     As such, Mr. Secker placed Epic on clear notice of his bona fide religious beliefs and practices that conflict with the Mandate.

**ANSWER**: Epic admits that Mr. Secker submitted a request for a religious accommodation, but as to the remainder of the allegations in paragraph 105, Epic lacks knowledge or information sufficient to form a belief as to the truth of the matters asserted, and therefore denies same.

106. Critically, Epic validated the religious sincerity of Mr. Secker's religious conflict in writing, and also further validated through going to the next step in the process and evaluating whether the company could accommodate his religious beliefs short of undue hardship (if Epic had not validated Mr. Secker's religious sincerity, the company would not have acknowledged its Title VII duty to accommodate short of undue hardship).

**ANSWER**: Denies.

107. Mr. Secker was then subjected to a series of adverse employment actions. First, he was coerced to violate his religious beliefs on counterfactual justifications (that the vaccines were "safe and effective," and that he must lose his job if he did not violate his religious integrity). Second, his religious accommodation request was denied. Third, he was terminated for declining to violate his religious beliefs.

**ANSWER**: Epic admits only that it did not grant Mr. Secker an exemption to its vaccination policy and denies the remaining allegations of paragraph 107.

108. Epic cannot satisfy the undue burden test because it would have been less than a minimal burden to have accommodated Mr. Secker, much less a "significant burden" or expense. *Groff,* 600 U.S. at 470.

**ANSWER**: Denies.

109. Epic refused to offer reasonable accommodations options to Mr. Secker that would have allowed him to preserve his successful career.

**ANSWER**: Denies.

110. Epic willfully refused to engage in a good faith process to identify what customers and clients were/were not requiring proof of vaccination, to identify if any such customers/clients had such clients would allow for alternative

safety protocols in lieu of mandatory vaccination, and further refused to examine whether the job duties could have been performed remotely and/or through recognition of natural immunity or voluntary schedule swapping.

**ANSWER**:  Denies.

111.    Epic refused to engage in a good faith interactive process to attempt to find a workable accommodation that would not pose undue hardship to the company. Had the company engaged in a good faith interactive process, it would have located multiple low-cost and no-cost options for Mr. Secker.

**ANSWER**:  Denies.

112.    Defendant could have accommodated Mr. Secker without undue hardship through, inter alia: (1) maintaining the status quo of telework; (2) acknowledging his documented natural immunity; (3) weekly testing (which was available for free throughout the country during the relevant time frames and was a more effective COVID-19 countermeasure ); (4) enhanced safety protocols; (5) voluntary schedule swapping in the rare event that Mr. Secker would have had to interact in person and any purported risks posed by such in-person meetings could not be mitigated through recognition of natural immunity, testing, enhanced safety protocols, etc., or (6) any combination of the above options.

**ANSWER**:  Denies.

113.    Instead, Epic instructed that Mr. Secker would be terminated and directed him to apply for alternative roles that Mr. Secker was overqualified for (and would receive substantially lower pay), or unqualified for given his experience and expertise. In this regard, Epic's actions constituted an additional adverse employment action, the opposite of a good faith interactive process calculated towards identifying an alternative that would have allowed Mr. Secker to preserve his hard-earned career and his religious beliefs. This is because reasonable accommodation of an employee's religion is "one that eliminates the conflict between employment requirements and religious practices." *Rodriguez v. City of Ch*i., 156 F.3d 771, 775 (7th Cir. 1998) citing *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 70, 93 L. Ed. 2d 305, 107 S. Ct. 367 (1986)).

**ANSWER**:  Denies.

114.    Reassignment may in some situations constitute a reasonable accommodation, if the reassignment is the same in all material respects and does not place the impacted employee in a worse position (which did not occur here). *See Wright v. Runyon,* 2 F.3d 214 (7th Cir. 1993); *See also Rodriguez v. City of Chi.,* 156

F.3d 771, 776 (7th Cir. 1998) (discussing cases that determine accommodation through job transfers or shift changes is deemed reasonable only if they do not result in a reduction of pay or loss of benefits).

**ANSWER**:   Paragraph 114 states a legal conclusion for which no response is required. To the extent a response is required, denies.

115.   In denying Mr. Secker's request, Epic asserted "undue hardship" based on counterfactual rationales and provided no justification as to why or how the several options proposed by Mr. Secker in his request were unable to be done without undue hardship. This is especially true where recognition of Mr. Secker's natural immunity and/or testing, or continued telework required no cost, effort, or operational change to the status quo.

**ANSWER**: Denies.

116.   On belief, Epic seamlessly accommodated other employees who worked in roles that required more in-person contact than Mr. Secker's, further demonstrating the company's ability to accommodate short of undue hardship.

**ANSWER**: Denies.

117.   Defendant's actions were willful, wanton, and/or malicious, and demonstrate reckless disregard for Mr. Secker's rights under Title VII.

**ANSWER**: Denies.

118.   As a direct and proximate result of Defendant's discriminatory treatment, Mr. Secker has suffered and continues to suffer economic and pecuniary damages for which he is entitled to judgment.

**ANSWER**: Denies.

119.   In addition to financial losses, Mr. Secker has suffered emotional and psychological harm from the uncertainty of unemployment and the repeated coercion to abandon his sincere religious beliefs in order to preserve his livelihood and career, all stemming from his unlawful termination.

**ANSWER**: Denies.

120.   As a result of the discriminatory treatment he experienced, he is suffering from emotional distress which is or has been marked by a series of

adverse manifestations (e.g., weight gain; lack of sleep; lack of focus and mental errors in everyday life; feelings of despondency; social anxiety; loss of interest in leisure activities; pronounced feelings of agitation and irritability; and a formal medical diagnosis of Major Depressive Disorder).

**ANSWER**: Denies.

121.    The foregoing conduct constitutes an illegal, intentional failure to accommodate and intentional discrimination that is prohibited under 42 USC § 2000e-2 *et seq.*

**ANSWER**: Denies.

122.    As a direct and proximate result of the discriminatory treatment, Plaintiff has suffered, and continues to suffer, the damages hereinafter described.

**ANSWER**: Denies.

123.    Accordingly, Mr. Secker requests relief as hereinafter described.

**ANSWER**: Denies.

**COUNT TWO**
**TITLE VII RELIGIOUS DISCRIMINATION**
**DISPARATE TREATMENT**
**U.S.C. § 200-E-2(A)(1))**

124.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

**ANSWER**:   Epic incorporates by reference its responses to the foregoing

paragraphs of this Complaint as if fully set forth herein.

125.    Ultimately, Mr. Secker will also demonstrate religious discrimination under a disparate treatment theory.

**ANSWER**: Denies.

126.    A prima facie case for disparate treatment based on religion requires a Plaintiff to demonstrate that: "(1) [he] was a member of a protected class, (2) [he] was qualified for the position, (3) [he] was subject to an adverse employment action, and (4) [he] was treated less favorably than others similarly situated, or that

other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Collins v. State of Ill.*, 830 F.2d 692, 698 (7th Cir. 1987) *quoting Ramsey v. American Air Filter Co.*, 772 F.2d 1303, 1307 (7th Cir. 1985)).

**ANSWER**:   Paragraph 126 states a legal conclusion for which no response is required. To the extent a response is required, admits.

127.    As a Christian who requested a religious accommodation, Mr. Secker belongs to a protected class. Epic, on numerous occasions, acknowledged that Mr. Secker was a member of a protected class, in writing, and by considering and rejecting his religious accommodations requests and acknowledging its Title VII obligations through citing undue hardship as the sole grounds for Mr. Secker's termination.

**ANSWER**:   Epic lacks knowledge or information sufficient to form a belief as to the truth of the matters asserted in paragraph 127 and therefore denies same.

128.    Mr. Secker's performance was exceptional. In other words, he was qualified for his position. His promotion to Application Manager in the months preceding the Mandate conclusively demonstrates that he was qualified for his position. Moreover, prior to the Mandate, Mr. Secker had earned an exceptional performance record. Simply put, he was an exceptional employee and was well qualified for his role.

**ANSWER**: Denies.

129.    Mr. Secker suffered a series of adverse employment actions, including through repeated coercion to violate his religious beliefs, the denial of his religious accommodation request, and finally, when Epic terminated him for declining to violate his religious integrity.

**ANSWER**: Denies.

130.    Epic pretextually claimed that it could not accommodate Mr. Secker without undue hardship. However, Mr. Secker could have been accommodated without any cost whatsoever (or less than de minimis costs) through the accommodation options discussed throughout.

**ANSWER**: Denies.

131.    On belief, Epic replaced Mr. Secker with a vaccinated employee who did not possess religious beliefs in conflict with vaccination, giving rise to an inference of discrimination.

**ANSWER**: Denies.

132.    On belief, Epic also accommodated unvaccinated employees similarly situated to Mr. Secker, provided those employees sought accommodation for secular medical reasons, generating additional plausible inferences of discrimination.

**ANSWER**: Denies.

133.    On belief, Defendant accommodated employees with medical reasons for exemption to the Mandate at higher rates than those who sought accommodation for religious reasons, showing a clear preference for secular justification over religious justification. This gives rise to additional inferences of unlawful discrimination. *See EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 774 (2015) (holding that Title VII's "disparate-treatment provision prohibits actions taken with the *motive* of avoiding the need for accommodating" religious beliefs) (emphasis in original)).

**ANSWER**: Denies.

134.    Refusing to accommodate religious beliefs because of their religious nature, but accommodating medical needs, is precisely the type of behavior the Supreme Court recently stated would violate Title VII. The Supreme Court ruled "a hardship that is attributable to employee animosity to a particular religion, to religion in general, or to the very notion of accommodating religious practice cannot be considered "undue."' *Groff*, 600 U.S. at 472.

**ANSWER**:   Paragraph 134 states a legal conclusion for which no response is required. To the extent a response is required, denies.

135.    On belief, if Epic did in fact provide religious accommodations, Epic provided such accommodations at higher rates to religious belief systems that differed from Mr. Secker's disfavored religious beliefs in conflict with vaccination (e.g., employees from faith systems other than Christianity or religious beliefs in conflict with vaccination that Epic considered more legitimate than Mr. Secker's specific religious conflict).

**ANSWER**: Denies.

136.    The circumstances surrounding Mr. Secker's termination also give rise to strong inferences of religious discrimination. Epic knew or should have known during the relevant time frames that the mandated vaccines were incapable of preventing infection of COVID-19. Yet, the company terminated Mr. Secker on provably false rationales, asserting that Mr. Secker must violate his religious beliefs because workplace safety could only be achieved through vaccination. Epic also knew that many low-cost and no-cost accommodations were readily available, yet counterfactually claimed the opposite. Epic also knew its vaccinated employees were contracting COVID-19 at similar or higher rates than unvaccinated religious employees who, like Mr. Secker, possessed natural immunity. Nonetheless, the company counterfactually maintained that Mr. Secker posed an unacceptable safety risk relative to its secular vaccinated employees, and that his career must, therefore, be ended. In these circumstances, an inference of discrimination is more than plausible.

**ANSWER**: Denies.

137.    Moreover, an inference of discrimination is raised by the fact that Defendant permitted employees who had been immunized artificially through vaccination to continue working with limited or no safety protocols placed upon them, despite actual knowledge that they were contracting and spreading COVID-19 during the relevant time frames, while it terminated religious employees like Mr. Secker who had been immunized naturally and possessed at least equal, and likely greater, protection against COVID-19.

**ANSWER**: Denies.

138.    Once the plaintiff establishes his prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). The plaintiff can then refute defendant's claim by showing the nondiscriminatory reason offered by the employer is a "pretext" for discrimination. *Id.*

**ANSWER**:  Paragraph 138 states a legal conclusion for which no response is required. To the extent a response is required, admits.

139.    For the reasons detailed throughout, any legitimate non-discriminatory reason offered by Epic is pretext.

**ANSWER**: Denies.

29

140.    If Epic's justification for the Mandate was truly about facilitating safety in the workplace, refusing to acknowledge natural immunity as an alternative to vaccination is fatal to its justification. Mr. Secker posed no greater threat to the workplace than his vaccinated colleagues due to the fact that the COVID-19 vaccine did not prevent the transmission or infection of COVID-19. Further, regular testing is and was a more effective means to mitigating against the spread of COVID-19, which was not only offered for free throughout the country during the relevant time frames, but was also a cost Mr. Secker would have gladly personally covered in order to keep his job.

**ANSWER**: Denies.

141.    In fact, vaccinated employees who do not test regularly pose the greatest risk of COVID-19 transmission due to the reality of asymptomatic spread.

**ANSWER**: Denies.

142.    When the Mandate was implemented, it was already apparent that the COVID-19 vaccines provided an undefined level of personal protection and, at best, only shielded individuals from experiencing the symptoms of COVID-19. At that time, however, it was clear the vaccines did not prevent infection and transmission. As such, vaccinated employees with a case of COVID- 19 are more likely than unvaccinated persons to intermingle publicly due to ignorance of their infection, and then spread the virus.

**ANSWER**: Denies.

143.    Because Defendant knew its vaccinated employees were contracting COVID-19 at similar or higher rates than naturally immune and religious employees, like Mr. Secker, and did not require vaccinated employees regularly test, while terminating Mr. Secker – a teleworker with natural immunity – based on counterfactual reasons, Defendant's actions were willful, wanton, and/or malicious, and demonstrate reckless disregarding for Mr. Secker's rights under Title VII.

**ANSWER**: Denies.

144.    As a direct and proximate result of Defendant's discriminatory treatment, Mr. Secker has suffered, and continues to suffer, economic and pecuniary damages for which he is entitled to judgment.

**ANSWER**: Denies.

145.     As a result of the discriminatory treatment he experienced, he is suffering from emotional distress which is or has been marked by a series of adverse manifestations (e.g., weight gain; lack of sleep; lack of focus and mental errors in everyday life; feelings of despondency; social anxiety; loss of interest in leisure activities; pronounced feelings of agitation and irritability; and a formal medical diagnosis of Major Depressive Disorder).

**ANSWER**:  Denies.

146.     The foregoing conduct constitutes an illegal, intentional failure to accommodate and intentional discrimination that is prohibited under 42 USC § 2000e-2 *et seq.*

**ANSWER**:   Paragraph 146 states a legal conclusion for which no response is required. To the extent a response is required, denies.

147.     As a direct and proximate result of the discriminatory treatment, Plaintiff has suffered, and continues to suffer, the damages hereinafter described.

**ANSWER**:  Denies.

148.     Accordingly, Mr. Secker requests relief as hereinafter described.

**ANSWER**:  Denies.

## COUNT THREE
## RELIGIOUS DISCRIMINATION
## WISCONSIN FAIR EMPLOYMENT ACT
## (Wis. Stat. § 111.31)

149.     Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as fully set forth herein.

**ANSWER**:   Epic incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

150.     The Wisconsin Fair Employment Act ("**WFEA**") parallels Title VII as WFEA also prohibits discrimination against the same protected classes, including religious practice or creed.

**ANSWER**:  Paragraph 150 states a legal conclusion for which no response is required. To the extent a response is required, admits; however, Epic affirmatively states the WFEA does not create or authorize a private right of action in court. See, e.g., *Busse v. Gelco Express Corp.*, 678 F. Supp. 1398 (E. D. 1988).

151.   Just as Title VII allows for the recovery of compensatory and punitive damages, the WEFA also affords such recovery in cases where an employer engages in unlawful discrimination on the basis of religion.

**ANSWER**:  Paragraph 151 states a legal conclusion for which no response is required. To the extent a response is required, denies and affirmatively states that no private right of action exists under the WFEA.

152.   The WFEA mirrors the framework of Title VII claims. As such, Mr. Secker will demonstrate under the WFEA that Epic engaged in intentional religious discrimination when it (1) denied Mr. Secker's religious accommodation request and later terminated him, and (2) when it engaged in disparate treatment discrimination on the basis of religion under *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.,* 575 U.S. 768, 771 (2015), *Collins v. State of Ill.*, 830 F.2d 692, 698 (7th Cir. 1987) and progeny.

**ANSWER**:  Paragraph 152 states a legal conclusion for which no response is required. To the extent a response is required, denies. No private right of action exists under the WFEA.

153.   A violation of 42 U.S.C. § 2000e-2(a)(1) is intentional discrimination, also known as "disparate treatment." *Abercrombie*, 575 U.S. at 771. *Abercrombie* teaches that both failure-to- accommodate claims and disparate treatment claims belong in the intentional discrimination category. *Id.* at 773

**ANSWER**:  Paragraph 153 states a legal conclusion for which no response is required. To the extent a response is required, admits.

154.   For the same reasons Epic engaged in intentional religious discrimination under Title VII, Epic also engaged in intentional religious discrimination under the WFEA.

**ANSWER**: Denies.

155.   Epic's actions were willful, wanton, and/or malicious, and demonstrate reckless disregard for Mr. Secker's rights under the WFEA.

**ANSWER**: Denies.

156.   As a direct and proximate result of Defendant's discriminatory treatment, Mr. Secker has suffered, and continues to suffer, economic and pecuniary damages for which he is entitled to judgment.

**ANSWER**: Denies.

157.   As a result of the discriminatory treatment he experienced, in violation of WFEA, he is suffering from emotional distress which is or has been marked by series of adverse manifestations (e.g., weight gain; lack of sleep; lack of focus and mental errors in everyday life feelings of despondency, social anxiety, loss of interest in leisure activities, pronounced feelings of agitation and irritability, and a formal medical diagnosis of Major Depressive Disorder).

**ANSWER**:   Denies. Further, even if the WFEA provided for a private right of action (which it does not), the WFEA does not allow for emotional distress or other compensatory damages.

158.   The foregoing conduct constitutes illegal, intentional religious discrimination that is prohibited under WFEA.

**ANSWER**: Denies.

159.   As a direct and proximate result of the discriminatory treatment, Mr. Secker has suffered, and continues to suffer, the damages hereinafter described.

**ANSWER**: Denies.

160.   Accordingly, Mr. Secker requests relief as hereinafter described.

**ANSWER**: Denies.

## AFFIRMATIVE AND OTHER DEFENSES

At this time, Epic asserts the following affirmative and other defenses to the claims in the Complaint.  Epic reserves the right to modify, add to or supplement its defenses.  In addition, by asserting these affirmative and other defenses to the claims in the Complaint, Epic does not assume any obligation or burden of proof that it not required by law.  Epic also reserves the right to add additional affirmative defenses as they become more evident through discovery and investigation.

1.      The Complaint fails, in whole or in part, to state a claim upon which relief may be granted.

2.      Epic's decisions with respect to Plaintiff's employment, including the decision to terminate his employment, were based on legitimate, non-discriminatory reasons.

3.      Epic could not have granted Plaintiff's religious accommodation request absent undue hardship.

4.      Epic acted in good faith and without malice, willfulness, reckless indifference, or evil intent.

5.      In the event that Plaintiff can demonstrate that his religion was a motivating factor in any alleged employment decision that he challenges, he is not entitled to money damages, reinstatement or other relief because Epic would have taken the same action the absence of any such impermissible factor.

6.      Subject to proof through discovery, Plaintiff's claims are barred in whole or in part by the doctrines of unclean hands, waiver and/or estoppel.

34

7.      Plaintiff cannot prove any facts showing that Epic's conduct was the proximate cause of any damages alleged in the Complaint.

8.      Subject to proof through discovery, Plaintiff has failed to mitigate his damages, if any.

9.      Any emotional distress allegedly suffered by Plaintiff was not caused by Epic.

10.     Plaintiff cannot prove facts showing that he possessed a sincerely held religious belief that prevented him from receiving the vaccination and gave rise to a right to provide a reasonable accommodation in the absence of undue hardship.

WHEREFORE, Epic respectfully requests that the Court enter judgment (a) dismissing the Complaint with prejudice; (b) awarding to Epic its attorneys' fees and expenses incurred in connection with this lawsuit; and (c) granting to Epic such other further relief as the Court may deem just and proper.

Dated this 8th day of November, 2024.

**MICHAEL BEST & FRIEDRICH LLP**
Attorneys for Defendant

By:   */s/Kurt F. Ellison*
      Amy O. Bruchs
      Kurt F. Ellison

MICHAEL BEST & FRIEDRICH LLP
One South Pinckney Street, Suite 700
P.O. Box 1806
Madison, WI  53701-1806
Phone:  608.257.3501
Fax:  608.283.2275
aobruchs@michaelbest.com
kfellison@michaelbest.com

35