**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

NATHAN SECKER,

      Plaintiff,

             v.

EPIC SYSTEMS CORPORATION, *a Wisconsin*
*for-profit Corporation,*

      Defendant.

Case No.: 3:24-cv-00630

---

**EXPERT REBUTTAL REPORT OF JEFFREY J. STODDARD, M.D.**

### I.    ASSIGNMENT

1.      I am providing a rebuttal report in relation to the above-captioned case on behalf of Plaintiff Nathan Secker ("Plaintiff" or "Mr. Secker") regarding the expert reports submitted on behalf of Defendant Epic Systems Corporation ("Epic" or "Defendant") regarding its COVID-19 vaccination mandate (the "Vaccine Mandate" or "Mandate").

2.      This includes the Summary of Opinions by Daniel Salmon, Ph.D. MPH, dated July 7, 2025 (hereinafter referred to as the "Salmon Report") and the Summary of Opinions of Jacqueline L. Gerhart, M.D., dated July 10, 2025 (hereinafter referred to as the "Gerhart Report").

3.      I base the following opinions and reports on information known to me at present. I reserve the right to change, amend, or alter these opinions if new information becomes known to me.

4.      My review and work regarding this Rebuttal Report involved an application of my education, training, and experience. Moreover, I have cited studies and other materials in this Expert Rebuttal Report. Unless otherwise stated, the studies or materials cited are reliable and relied upon in the medical field, and, in all events, unless otherwise stated, I have found the cited

studies and their methodology reliable. The opinions set forth in this Rebuttal Report are to a reasonable degree of medical probability.

## II.    CREDENTIALS AND RELEVANT EXPERIENCE

5.    I am a licensed and board-certified medical doctor. I graduated from the University of Wisconsin Medical School in 1988, completed my residency at the Johns Hopkins Hospital in Baltimore, Maryland, and completed postdoctoral training in Health Policy at the University of California-San Francisco. *See* Curriculum Vitae, attached as Exhibit 1.

6.    I am Board Certified by the American Board of Pediatrics and I hold a current license to practice Medicine in the State of Wisconsin, although I recently retired and do not maintain an active practice at this time. Over my career, I worked as an "in-house" full time medical professional and researcher in six different biopharmaceutical companies, including five major vaccine manufacturers. In my role at these companies, my efforts contributed to ten different vaccines being brought to market, including FluMist, Menveo, Ixiaro, Bexsero, Focetria, Celtura, FLUCELVAX, Fluad, Shingrix, and JCOVDEN (The Johnson & Johnson COVID-19 vaccine). My work also extensively involved designing, reviewing and conducting studies of various types including randomized controlled trials, case-control studies, cohort studies, cluster randomized trials, registries and observational studies.

7.    I have had extensive recent experience researching, testing, developing, commercializing and formulating policy specifically relating to SARS-CoV-2/COVID-19[1] viral vaccines. From 2019 to 2023, I was employed by Janssen Global Services (the pharmaceutical

---

[1] Throughout this report, SARS-CoV-2 and COVID-19 are used interchangeably.

affiliate of Johnson & Johnson) as their Vice President and Head of Global Medical Affairs for Infectious Diseases and Vaccines.

8.      In that role, and over that time span, I had responsibility over many aspects of the Johnson & Johnson COVID-19 vaccine development program, including clinical development program design, human research study design, late-stage development, clinical research conduct, medical efficacy assessment, pharmacovigilance and safety assessment, and rollout of clinical data to regulatory and policy bodies throughout the world.  Specifically, I reviewed newly unblinded clinical data, wrote sections of regulatory documents for Emergency Use Authorization, presented clinical data to government recommending bodies, and authored seven publications in top tier medical journals pertaining to COVID, COVID vaccine, and COVID vaccination. *See* Exhibit 2, list of publications. Further, I provided expert technical, scientific and clinical advice to twelve national governments regarding COVID-19 and including mores specifically regarding COVID-19 vaccination policies. These included governmental bodies in the United States, United Kingdom, Canada, Australia, Germany, France, Netherlands, Belgium, Switzerland, Denmark, South Africa and Brazil.

9.      Throughout the COVID-19 pandemic, I held professional responsibilities that directly related to population-based vaccination decision-making, public health policies related to minimizing the spread of COVID-19, and my professional responsibilities were also relevant to individual-level medical decision-making with respect to risk and benefit assessments pertaining to COVID vaccination for individual patients.

10.     My review and work in this matter involved an application of my education, training, and experience. Moreover, I have cited studies and other materials in this expert report. Unless otherwise stated, the studies or materials cited are reliable and relied upon in the medical

field, and, in all events, unless otherwise stated, I have found the cited studies and their methodology reliable.

### III.    STATEMENT OF COMPENSATION

11.    I am being compensated on the basis of $400/hour and travel expenses.

### IV.    TESTIMONIAL HISTORY

12.    I testified in the following cases as an expert at trial or by deposition during the previous 4 years:

> *DeCostanzo v. GlaxoSmithKline PLC, et al*
> Plaintiff: Lori DeCostanzo
> Defendant: GlaxosmithKline PLC and GlaxoSmithKline, LLC
> Case Number: 2:2021-cv-04869
> Filed: August 29, 2021
> Court: U.S. District Court for the Eastern District of New York

### V.    BACKGROUND AND MATERIALS CONSIDERED

13.    It is my understanding that the Plaintiff in this case, Mr. Nathan Secker, possesses religious beliefs in conflict with receiving a COVID-19 vaccine and requested a religious accommodation from Epic Systems so he could maintain employment in his position while observing his religious beliefs and practices in conflict with receipt of a COVID-19 vaccine.

14.    It is also my understanding that Plaintiff worked for Epic Systems as a Project Manager. It is my understanding that as a Project Manager, Mr. Secker was at times required to travel to healthcare facilities as part of his job, but that his job role did not require him to regularly enter patient care areas, nor to have any direct patient contact as part of his job role.

15.    In addition to the materials cited in this Declaration, I have also reviewed the filings and documentation related to this case, to include the Complaint, Answer, the Gerhart Report, the

Salmon Report, and Epic Systems' EEOC Position Statement and Plaintiff's response, as well as other miscellaneous documentation relating to Plaintiff's claims against Epic Systems.

16.     It is my understanding that discovery in this case is ongoing and that there will likely be more documentation exchanged by the parties. It is also my understanding that depositions with be taken in this case. I reserve the right to revise and/or supplement my opinions as additional materials are shared or become available.

## VI.    SUMMARY OF REBUTTAL OPINIONS

### A.  Overview of Rebuttal to The Salmon Report and the Gerhart Report

17.     I have reviewed the expert reports provided by Dr. Salmon and Dr. Gerhart on behalf of Defendant and have formed specific opinions on their content and accuracy.

18.     Based on my review and analysis of the Salmon Report and the Gerhart Report, my review of available materials, and my professional experience, I have formed the following rebuttal responses.

19.     There were reasonable and well-founded alternatives to vaccination Epic Systems could have implemented to ensure workplace safety for Plaintiff's job role as a countermeasure to the risks associated with COVID-19, including in terms of preventing infection and transmission of the target pathogen (SARS-CoV-2). These alternatives would have ensured a safe workplace, including all employee/client interactions, to an equal or greater degree than reliance upon employee vaccination alone. From an immunological, epidemiological, and public health standpoint, Epic Systems could have preserved and protected the safety of its workforce and its clients (as well as those clients' patients) by requiring all employees in his position to test regularly, mask when appropriate, to quarantine when symptomatic, to submit to antibody testing (i.e., showing proof of natural immunity), to telework and/or schedule swap when necessary and for a

temporary amount of time, and to submit to other COVID-19 countermeasures recommended by public health authorities and detailed throughout this report, or any combination of the above. These safeguards are at least as effective COVID-19 countermeasures relative to a strict standalone vaccination policy, particularly in terms of counteracting the risks of infection and transmission. If these safety measures are simultaneously adhered to by an unvaccinated individual, particularly if that individual was immunologically normal and had experienced prior COVID infection and recovered from it, then that individual poses a lesser risk to become infected and to then transmit the virus than an individual who is vaccinated, but who is not also observing these safety protocols.

20.     Of critical importance, because the COVID-19 vaccines are not sterilizing vaccines, and because individuals vaccinated with these vaccines are certainly capable of being infected with and transmitting SARS-CoV-2 (the virus that causes COVID-19), these protocols should have applied equally to vaccinated and unvaccinated persons alike in Plaintiff's position if the company's goal was to counteract the spread of COVID-19 and to minimize risk of infection. For these reasons, and those more fully detailed throughout, Defendant could have offered alternatives to vaccination for Plaintiff and these alternatives would have been equally, if not more, effective at reducing infection and transmission risks relative to vaccination.

21.     All opinions rendered herein are rendered to a reasonable degree of certainty.

22.     Many of the opinions rendered in Dr. Salmon's Report are not relevant or not disputed and therefore are not addressed in this Rebuttal Report.

## VII.    REBUTTAL OPINIONS TO THE GERHART REPORT

23.    **Gerhart Opinions:** **"What we found was that the vaccination provided an additive benefit of protection against COVID-19. I was a co-author of an article on one study, which is attached."**[2]

**Responses:** Dr. Gerhart does not reference any sources, other than generally allude to a study she participated in, and makes only conclusory statements without underlying analysis or referencing any citation to support her conclusions. I do not disagree there was an additive benefit of protection against symptomatic infection, and/or severe health outcomes for those vaccinated against COVID-19. But, those vaccinated for COVID-19 could and did still contract and transmit COVID-19. Dr. Gerhart does not clarify whether the vaccination-based benefit she alludes to relates to individual-level, personal protection against symptomatic infection or severe COVID-19 outcomes, or a benefit in terms of stopping or significantly reducing the spread of COVID-19 for any meaningful period of time.  For the reasons detailed throughout this Rebuttal Report, COVID-19 vaccination was incapable of preventing infection and transmission of the virus, and was not capable of meaningfully reducing transmission rates for any appreciable period of time. In contrast, there were alternatives to vaccination, detailed throughout this Rebuttal Report, that were capable of meaningfully detecting asymptomatic infection, reducing the risk of infection, and reducing transmission rates for extended periods of time. Mr. Secker could have utilized such enhanced safety protocols in lieu of vaccination and, had he been permitted to do so, would have presented a lesser transmission risk than an employee who was vaccinated alone (see full analysis below).

24.    **Gerhart Opinions:** **"One issue addressed by the group was whether to implement a vaccine mandate for Epic employees in the fall of 2021. In the**

---

[2] Gerhart Report, at 1.

**context of that issue, I provided my opinion that the vaccine was safe and effective at reducing the spread and severity of COVID-19."[3]**

**Responses:** The COVID-19 vaccines were incapable of preventing infection, especially asymptomatic infection, and were incapable of preventing transmission. The vaccines were also incapable of meaningfully reducing infection and transmission rates for any considerable period of time, as evidenced by waning vaccine efficacy (known before Plaintiff was terminated, by mid-2021, at latest), and as evidenced by diminished efficacy against novel viral variants as they emerged.

25.    In fact, the original Pfizer trial supporting its FDA approval was never structured to test for transmission reduction and this is part of the record in the Emergency Use Authorization ("EUA") review. Even in December 2020, Pfizer explicitly identified the following "data gaps" to the FDA:

- Duration of protection;
- Effectiveness in certain populations at high risk of severe COVID-19;
- Effectiveness in individuals previously infected with SARS-CoV-2;
- Future vaccine effectiveness as influenced by characteristics of the pandemic, changes in the virus, and/or potential effects of co-infections;
- Vaccine effectiveness against asymptomatic infection;
- Vaccine effectiveness against mortality; and
- Vaccine effectiveness against transmission of SARS-CoV-2.[4]

26.    By mid-2021, real world examples and public pronouncements by health authorities further confirmed that the vaccines were incapable of stopping infection and transmission of the virus.

---

[3] Gerhart Report, at 1.

[4] *See* Pfizer-BioNTech COVID-19 Vaccine EUA Amendment Review Memorandum 05262021, *available at* https://www.fda.gov/media/148542/download#page=38 (emphasis added).

27.     On August 6, 2021, a study that focused on a COVID-19 outbreak in Barnstable County, Massachusetts, was published.[5]   The study analyzed a July 2021 outbreak amongst residents with a 69% vaccination rate.[6]   The study observed 469 COVID-19 cases.  74% of those infected were fully vaccinated.[7]  The study noted that "[a]mong fully vaccinated symptomatic persons, the median interval from completion of more than fourteen days after the final vaccine dose to symptom onset was eighty-six days (range = 6–178 days)."[8]  Importantly, the study concluded that precautions should be taken regardless of vaccination status: "Transmission mitigation measures included broadening testing recommendations for persons with travel or close contact with a cluster-associated case, irrespective of vaccination status; local recommendations for mask use in indoor settings, irrespective of vaccination status."[9] The study also found that the fully vaccinated infected residents, on average, had more virus in their nasal cavity than the infected unvaccinated residents.[10] This would suggest that there exists, biologically, a higher likelihood of ability to transmit SARS-CoV-2 virus by vaccinated individuals compared to unvaccinated individuals.  There may well also be heightened risk of transmission from vaccinated individuals with asymptomatic infection due to behavioral characteristics of vaccinated people (e.g. lower likelihood of testing, lower detection of asymptomatic infection, reduced tendency to mask and to socially distance, etc.).[11]

---

[5] *See* Catherine Brown, et. al, *Outbreaks of SARS-CoV-2 Infections, Including COVID-19 Vaccine Breakthrough Infections, Associated with Large Public Gatherings - Barnstable County, Massachusetts, (*July 2021*) available at* https://pubmed.ncbi.nlm.nih.gov/34351882/.

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *See, e.g.,* Buckell, et. al, *COVID-19 vaccination, risk-compensatory behaviors, and contacts in the UK,* Scientific Reports, (May 2023) (concluding "that risk compensation suggests that gains in personal

28.    Consistent with these findings, federal health authorities also announced the COVID-19 vaccines may help prevent but do not definitively prevent either infection or transmission of COVID-19.  On August 6, 2021, the then head of the CDC, Rochelle Walensky, publicly announced that the COVID-19 vaccines worked "with regard to severe illness and death . . . [b]ut what they c[ouldn]'t do anymore is prevent transmission."[12]

29.    In August of 2021, a joint study by the CDC and the Wisconsin Department of Health services further confirmed Director Walensky's statement—the study indicated that vaccinated individuals had a 5% higher viral load than the unvaccinated.[13] This joint study, which was published and is reliable evidence, reviewed swab specimens in twenty-four counties and found a higher viral load in "158 of 232 unvaccinated (68%) and 156 of 225 fully vaccinated (69%) symptomatic individuals" and high viral loads in "7 of 24 unvaccinated (29%) and 9 of 11 fully vaccinated asymptomatic individuals (82%)."[14] This study conclusively demonstrated vaccinated individuals were fully capable of contracting COVID-19, and carried high viral loads when infected, demonstrating not only the vaccines' inability to prevent infection, but also the inability to reduce the viral load relative to unvaccinated individuals.

30.    Moreover, any claimed efficacy against symptomatic infection wanes rapidly. Public health authorities recognized early on that any protection afforded by the COVID-19

---

safety, as a result of vaccination, are offset by increases in risky behaviour, such as socialising, commuting and working outside the home. This is potentially important because transmission of SARS-CoV-2 is driven by contacts, which could be amplified by vaccine-related risk compensation.").

[12] *See* CNN, *Fully Vaccinated People Who Get a Breakthrough Infection Can Transmit the Virus,* (Aug. 5, 2021), *available at* https://edition.cnn.com/us/live-news/coronavirus-pandemic-vaccine-updates-08-05-21/h_d2accec79fdc37f422d02c536828ea1e.

[13] *See* Riemersma, et. al, *Shedding of Infectious SARS-CoV-2 Despite Vaccination* medRxiv (August 24, 2021), *available at* https://www.medrxiv.org/content/10.1101/2021.07.31.21261387v4.full.pdf.

[14] *Id.*

vaccines wanes rapidly, as demonstrated by the CDC's repeated recommendations for regular booster shots, including such guidance in the Fall of 2021.[15]  However, it is important to highlight that the SARS-CoV-2 virus' rate of mutation far surpassed the speed with which the major vaccine manufacturers' were able to update or modify their vaccines' mRNA coding, and therefore boosters of vaccine consisted of outdated strains, affording little in the way of protection with each booster.

31.     Dr. Anthony Fauci has recognized the limitations of the vaccines to protect against transmission relative to COVID-19 variants, stating:

> *However, as variant SARS-CoV-2 strains have emerged, deficiencies in these [COVID-19] vaccines reminiscent of influenza vaccines have become apparent. The vaccines for these two very different [mucosal respiratory] viruses have common characteristics: **they elicit incomplete and short-lived protection against evolving virus variants that escape population immunity** ... Taking all of these factors into account, it is not surprising that none of the predominantly **mucosal respiratory viruses have ever been effectively controlled by vaccines.** This observation raises a question of fundamental importance: if natural mucosal respiratory virus infections do not elicit complete and long-term protective immunity against reinfection, how can we expect vaccines, especially systemically administered non-replicating vaccines, to do so?*[16]

32.     With the emergence of the Delta variant in the Summer of 2021, and the Omicron variant in the Fall/Winter of 2021, it became abundantly clear that any claimed vaccine efficacy

---

[15] *See* CDC*, CDC Expands COVID-19 Booster Recommendations,* (November 29, 2021), *available at* https://archive.cdc.gov/www_cdc_gov/media/releases/2021/s1129-booster-recommendations.html#:~:text=Today%2C%20CDC%20is%20strengthening%20its%20recommendation%20on%20booster,or%202%20months%20after%20their%20initial%20J%26J%20vaccine.

[16] *See* A. Fauci, et. al, CELL HOST & MICROBE, *Rethinking next-generation vaccines for coronaviruses, influenzaviruses, and other respiratory viruses* (January 11, 2023), *available at* https://www.cell.com/cell-host-microbe/fulltext/S1931-3128(22)00572-8 (emphasis added).

against prevention of infection and transmission was unsupportable as vaccine efficacy against infection and transmission waned significantly.[17]

33.     Moreover, the personal protection benefit afforded by vaccination is also present in immunization through prior infection and recovery (i.e., "natural immunity").

34.     **Gerhart Opinion: "I also provided my medical opinion that it would be unsafe for an unvaccinated Epic employee to be allowed entry into a customer facility, to work with healthcare workers and customers' employees, sometimes in close proximity to patients."** Gerhart Report, at 1.

**Responses:** Apparently, Dr. Gerhart advised Defendant allowing an unvaccinated employee to travel to customer locations to work side-by-side with end users of Defendant's software, sometimes in patient care areas and sometimes in the same room as patients, would pose an unacceptable health and safety risk to healthcare providers and patients. *See generally id.*

 Such opinions fail to address the key issue in this case – whether Mr. Secker could have been accommodated through alternatives to vaccination without sacrificing workplace safety relative to a vaccinated employee. He could have. For the reasons detailed throughout this Rebuttal Report, an unvaccinated person observing quarantine (when symptomatic) protocols, testing before in-person interactions, masking, demonstrating proof of natural immunity, or other enhanced safety protocols (social distancing, handwashing, etc.), posed a lesser transmission risk than a person who was vaccinated alone.[18]  These are countermeasures that the CDC highlighted

---

[17] *See* Chemaitelly, et. al., NEW ENGLAND JOURNAL OF MEDICINE, *Waning of BNT162b2 Vaccine Protection against SARS-CoV-2 Infection in Qatar* (Dec. 2021) (concluding vaccine induced protection against SARS-CoV-2 infection waned rapidly, but protection against hospitalization and death persisted at for 6 months after the second dose).

[18] To the extent Dr. Gearhart advised Defendant, or is of the opinion that masking and testing, or any other safety measure discussed in this Rebuttal Report, were neither safe nor effective countermeasures preventing the spread of COVID-19 relative to vaccination, I strongly disagree for the reasons detailed throughout.

during the relevant timeframe as desirable methods for employers to utilize to counteract the threats of COVID-19.[19]

35.    It is also important to emphasize the risks between frequent person-to-person interactions and infrequent person-to-person interactions, including with patients in a healthcare setting.  Infrequent work-directed visits to health care facilities where information technology workers work in the same building with patients (but have no direct patient contact) is not remotely analogous to working as a traditional health care worker ("HCW") such as a nurse, and it is disingenuous to conflate the two types of work.  Many non-HCW workers who occasionally visit health care facilities (e.g. facilities personnel, maintenance staff, food service workers, librarians, housekeeping staff, etc.) could, without sacrificing workplace safety, rely upon non-vaccination infection control measures such as regular testing, isolation in the event of a positive test result, quarantining when symptomatic, masking, social distancing, etc., with or without a requirement for vaccination throughout the pandemic.[20] It would be incorrect to presume that official ACIP COVID-19 vaccination recommendations specific to HCWs apply to all workers who intermittently work (as non-HCWs) in health care facilities.

36.    In any event, taken together, the non-vaccination infection control measures, if used in a stacked manner, would be at least as effective, it not more effective, than vaccination alone for non-HCWs who intermittently visit health care facilities during their work, which is addressed

---

[19] *See, e.g., CDC, Role of Businesses and Employers in Responding to COVID-19* (updated March 8, 2021) (advising employers to encourage "sick employees to stay home", to consider "conducting daily in-person or virtual health checks", to employ "social distancing" protocols, to encourage use of facemasks and other PPE, and to consider incorporating testing for SARS-CoV-2 into workplace preparedness" planning), *available at* https://web.archive.org/web/20210813015320/https://www.cdc.gov/coronavirus/2019-ncov/community/guidance-business-response.html.

[20] *See* comparative risk analysis for vaccination vs. versus non-pharmaceutical interventions ("NPIs"), discussed below at pp. 16-31.

more fully below.[21] In fact, the non-vaccination infection control measures, if used in a stacked manner, would be more effective than vaccination alone for HCW's who regularly interact with patients. In other words, a vaccinated employee, especially one that has not had a booster injection and is relying on vaccination alone as a countermeasure, would present a greater health and safety risk to others than an unvaccinated individual who was observing the safety protocols detailed throughout this Rebuttal Report.

## VIII.    REBUTTAL OPINIONS TO THE SALMON REPORT

37.    **Issue Addressed by Dr. Salmon: In August to October 1, 2021 (the "Relevant Time Period"), in the context of Epic employees whose jobs required them to travel to healthcare facilities to work side by side with healthcare customers' employees on the installation and use of Epic's software, exposing others to the virus, what was known or assumed about the nature of the risks of COVID-19?[22]**

**Salmon Opinions:** "At the time it was well accepted among the scientific community that COVID-19 spread person to person through respiratory droplets…. At this point, it was well accepted in the scientific community that asymptomatic persons were transmitting COVID-19. Asymptomatic transmission of COVID-19 in health care facilities was a major problem through October 1, 2021. Many health care facilities were regularly testing staff. However, such tests were imperfect and testing frequency limited the value of testing in detecting asymptomatic infections as discussed later in this report. Often, patients in health care settings were at increased risk of severe COVID-19 because of underlying health conditions and age. Specifically, in respect to

---

[21] To the extent Dr. Gearhart advised Defendant or is of the opinion that the COVID-19 vaccines helped avoid people getting infected with COVID-19 in general and/or reduced the spread of the disease overall, it is my opinion that is not the case relative to an unvaccinated individual who is observing one or more of the COVID-19 countermeasures discussed throughout this Rebuttal Report, and especially

[22] Salmon Report, at 4.

Epic employees whose jobs required them to travel to healthcare facilities to work side by side with healthcare customers' employees on the installation and use of Epic's software, such employees would have the potential to transmit COVID-19 to others working in such healthcare facilities and potentially patients, even if they did not come into direct contact." Salmon Report, at 4.

**Responses:**

a.    As detailed throughout, vaccinated individuals were perfectly capable of becoming infected (especially asymptomatically infected) and transmitting SARS-CoV-2/COVID-19. An unvaccinated person observing quarantine (when symptomatic) protocols, testing before in-person interactions, quarantining when testing positive, masking, demonstrating proof of natural immunity, or other enhanced safety protocols (social distancing, handwashing, etc.), posed a lesser transmission risk than a person who was vaccinated alone.  *See* relevant analysis of countermeasures to vaccination at pp. 16-31.

b.    And Dr. Salmon consistently conflates working as a healthcare worker and working in health care settings as an information technology project manager.  The distinction between working as a HCW and working "shoulder to shoulder" with health care workers, as a non-HCW who has infrequent contact with others is particularly relevant to the key issue in this case – whether Mr. Secker could have been accommodated with alternative countermeasures to vaccination without sacrificing workplace safety.  The nature of the work is profoundly different in the two cases.  Whereas HCWs have direct and very close patient contact  (which may include examining, touching, lifting, physically moving patients, etc.), non-HCWs who work in health care settings are generally precluded from having any direct patient contact.  Thus, this difference is substantial and should not be glossed over.  It would be misleading to say they are analogous; they

are not, and in any event, even if Mr. Secker had been classified as a traditional HCW that regularly worked with patients, he could have been accommodated with alternative (non-vaccination) countermeasures to infection and transmission that would have been more effective than vaccination alone.

    c.    The most obvious countermeasure in Mr. Secker's case would have been to require him to test regularly, mask, and show proof of a negative test before entering a hospital. In addition, he could have quarantined if symptomatic (assuming a negative test, but that he was potentially infected), or if he tested positive at any time. In such a case, Mr. Secker would have posed no more of a threat to spread COVID-19 than an individual who was vaccinated.

    38.    **<u>Issues Addressed by Dr. Salmon:</u> What were the known or assumed benefits of the COVID-19 vaccination as of the Relevant Time Period? And "During the Relevant Time Period, was in known or assumed that masking, social distancing (to the extent possible) and periodic testing would have minimized the risk Mr. Secker posed to healthcare facilities' employees, to the same extent being fully vaccinated against COVID-19 would have?"**

**<u>Salmon Opinions</u>:**

    a.    "COVID-19 vaccines were known through very large randomized controlled trials and real-world effectiveness studies to reduce disease, as discussed in detail in this report. It was assumed that COVID-19 vaccines reduced transmission based upon what was known about COVID-19, infectious disease epidemiology and vaccinology." Salmon Report, at 5.

    b.    "Each of these approaches – vaccination, masks, testing, social distancing – all have the potential to reduce disease transmission but are all imperfect by themself. While the vaccines were shown to have very high efficacy, they are imperfect and some people who are vaccinated will still contract and transmit disease." *Id.* at 13-14.

**<u>Responses</u>:**

a.  It is not disputed that, based upon the original efficacy trials, COVID-19 vaccination at the outset of the pandemic demonstrated a degree of vaccine efficacy against symptomatic infection for vaccinated individuals compared with unvaccinated individuals. Moreover, it is undisputed that the COVID-19 vaccines showed varying degrees of efficacy (certainly not 100%) in the reduction of severe health outcomes from SARS-CoV-2 infection.

b.  It is not accurate to say however "it was assumed that COVID-19 vaccines reduced transmission." No evidence was ever presented by the vaccine manufacturers to FDA that the COVID vaccines reduced transmission.   And with the emergence of the Delta variant in the Summer of 2021, and the Omicron variant in the Fall/Winter of 2021, it became abundantly clear that any claimed vaccine efficacy against sustained prevention of infection and transmission was unsupportable as any claimed vaccine efficacy against infection and transmission waned significantly.[23]   In the best of circumstances, the COVID-19 vaccines were able to provide only incomplete protection against infection and transmission of SARS-CoV-2, with certainly less than 100% efficacy, with some studies showing negative efficacy over time.[24] No precise point estimates of efficacy against transmission provided by the vaccines were ever demonstrated, so this remained unknown throughout the pandemic. What was known, however, was that transmission from and to vaccinated individuals could and did occur. This is because the vaccines were not ever demonstrated to block or prevent person-to-person transmission of COVID-19 (and

---

[23] *See* Chemaitelly, et. al., NEW ENGLAND JOURNAL OF MEDICINE, *Waning of BNT162b2 Vaccine Protection against SARS-CoV-2 Infection in Qatar* (Dec. 2021) (concluding vaccine induced protection against SARS-CoV-2 infection waned rapidly, but protection against hospitalization and death persisted at for 6 months after the second dose).

[24] *See, e.g., Effectiveness of COVID-19 vaccines against Omicron or Delta symptomatic infection and severe outcomes available at* https://www.medrxiv.org/content/10.1101/2021.12.30.21268565v2 (demonstrating **negative** efficacy for vaccine-based immunity); *see also* Danish Cohort Study, *available at* https://www.medrxiv.org/content/10.1101/2021.12.20.21267966v2.  (demonstrating the same).

in fact, the CDC publicly announced in July of 2021 that vaccinated individuals could become infected and when infected, carried similarly high viral loads).[25] Moreover, it is notable that, while the scientific literature supports that receipt of the vaccine may confer a personal benefit of reducing the chances of symptomatic infection as well as reducing the chances of severe illness or death, the vaccines were not authorized for use under EUA based upon demonstration of prevention of severe lower respiratory tract illness or death, nor were they subsequently licensed based upon any confirmatory data of prevention of severe respiratory disease or death.[26]

c.    Moreover, some published (peer-reviewed) research has shown that the risk of contracting COVID-19 actually may increase in association with the number of doses received.[27]

d.    Additionally, any assumption of reduced transmission through vaccination comes from a misapplication of critical premises in this case. Specifically, Dr. Salmon fails to account for an unvaccinated individual who is observing enhanced safety protocols. Dr. Salmon also fails to account for the reality that vaccinated persons are realistically more likely to intermingle publicly, even if symptomatic, due to a false sense of security regarding the capabilities of the COVID-19 vaccines.[28] I am not of the opinion that an unvaccinated employee, not practicing any

---

[25] *See* Exhibit 3, Statement from CDC Director (July 30, 2021); *see also* CDC, *5 Things you Should Know About COVID-19 Vaccines*, *available at* https://www.cdc.gov/ncird/whats-new/5-things-you-should-know.html https://www.cdc.gov/ncird/whats-new/5-things-you-should know.html#:~:text=COVID19%20vaccines%20save%20lives,and%20protect%20the%20public's%20health (stating that Covid-19 vaccines "are not always effective at preventing infection" but stating data supports that the vaccines "prevent severe illness" in the vaccine recipient).

[26] *See* fn. 4, above.

[27] *See* Nabin K. Shrestha *et. al.*, MedRxiv, *Effectiveness of Coronvirus Disease (COVID-19) Bivalent Vaccine,* (Dec. 19, 2022), *available at* https://www.medrxiv.org/content/10.1101/2022.12.17.22283625v1 (in comprehensive study, researchers found the risk "of COVID-19 increased with time since the most recent prior COVID-19 episode **and with the number of vaccine doses previously received**") (emphasis added).

[28] *See* Buckell, et. al, *COVID-19 vaccination, risk-compensatory behaviors, and contacts in the UK,* Scientific Reports, (May 2023) (concluding that "[r]isk compensation suggests that gains in personal safety, as a result of vaccination, are offset by increases in risky behaviour, such as socialising, commuting

enhanced safety protocols at all, presents the same risk of infection to others as a vaccinated employee who is observing enhanced safety protocols. I am of the opinion that an unvaccinated employee, layering enhanced safety protocols, as discussed throughout—to include regular masking, testing, social distancing, showing proof of natural immunity, hand washing, quarantining, etc., or any combination of the above—is a lesser transmission risk than a vaccinated employee. And any risk comparison between an unvaccinated person observing enhanced safety protocols must integrate the possibility that vaccinated persons may be more likely to intermingle, even if symptomatic, due to a false sense of security and misunderstanding of the limitations of the vaccines at issue.   A false sense of security possessed by those who received a COVID-19 vaccination and their behavioral patterns of integration back into every day, normal activities, coupled with their risk of asymptomatic infection (due to vaccination) would actually increase their transmission risk of COVID-19 to others, and especially relative to an unvaccinated individual who was strictly observing enhanced safety protocols.   A vaccinated person with asymptomatic infection is unlikely to know they are infected if they do not test, and a vaccinated individual is less likely to test compared to an unvaccinated person who regularly tests.   Therefore, unvaccinated persons following testing protocols are more likely to detect early infection, and asymptomatic infection, and are thereby less at risk to transmit infection to others compared with vaccinated individuals who do not test.[29]

     e.    **Testing as an Accommodation Option.**[30] Additionally, testing alone—in terms of preventing infection and transmission for an individual in Plaintiff's role—is a more effective

---

and working outside the home. This is potentially important because transmission of SARS-CoV-2 is driven by contacts, which could be amplified by vaccine-related risk compensation.").

[29] *See id.*

[30] The alternative countermeasures outlined below are meant to rebut Dr. Salmon's opinions that masking, testing, and social distancing may not have been feasible in Mr. Secker's situation. Salmon

countermeasure than a vaccination program where additional safety measures are not observed. The CDC has repeatedly validated that testing lowers the chance of spreading COVID-19 to others.[31] That makes both intuitive and medical sense: detection of a disease enables a person to self-quarantine and take other measures that aid in reducing transmission. With respect to control of spread of SARS-CoV-2 virus in the workplace, the approach of routine regular testing is worthy of some review. Reliable scientific literature published before Plaintiff was terminated supports that testing can be an effective countermeasure in reducing the rate of COVID-19 infection and transmission. In 2020, reliable research funded by the UK Medical Research Council ("MRC") and published by Grassly and colleagues in the Lancet presented the results of a mathematical modeling study to compare regular testing strategies using molecular diagnostic tests for COVID-19 control.[32] These authors focused primarily on testing strategies involving healthcare workers for infection control, and they concluded "we estimate that weekly screening of healthcare workers for infection through PCR testing would reduce their contribution to SARS-CoV-2 transmission by around one quarter on top of any reductions already achieved by self-isolation following onset of symptoms."[33]

---

Report, at 5. While Dr. Salmon does not specifically address on pages 4-6 of his report the supposed infeasibility of other countermeasures, such as quarantining and recognition of natural immunity, he does address those issues in other portions of his Report. *See, e.g.,* Salmon Report at, at 20-21. I have added discussion of additional countermeasures because Dr. Salmon failed to address the feasibility of offering those countermeasures as an accommodation option, and they are highly relevant to the critical issues in this case.

[31]    CDC, *Respiratory Virus Guidance, available at* https://archive.cdc.gov/#/details?url=https://www.cdc.gov/respiratory-viruses/guidance/faqs.html.

[32] Grasley, et. al, The Lancet, *Comparison of molecular testing strategies for COVID-19 control: a mathematical modelling study*, (Dec. 2020), available at https://www.sciencedirect.com/science/article/pii/S1473309920306307.

[33] *Id.*

Additional reliable scientific literature published before Plaintiff was terminated supports that routine testing be an effective countermeasure against reducing the rate of COVID-19 infection and transmission. In a study published by Chin and colleagues utilized simulation modeling to evaluate the optimal frequency of viral testing, and found that routine testing substantially reduced risks of outbreaks.[34] Chin and colleagues concluded "this simulation study finds that in high risk settings with ongoing community-based transmission, frequent (twice weekly) routine asymptomatic viral testing may be required to prevent outbreaks and reduce case counts of COVID-19."[35]

Reliable scientific literature also supports that testing can be an effective countermeasure for reducing the rate of infection and transmission in high density settings. In July of 2021, Kiang and colleagues published an important article in the Lancet also pertaining to testing as a strategy to reduce transmission of SARS-CoV-2.[36]  This study conducted simulation modeling of airline travel, and showed that for a "cohort of 100,000 airline travelers, in a scenario with no testing or screening, there would be 8357 (95% uncertainty interval 6144-12831) infectious days with 649 (505-950) actively infectious passengers on the day of travel. The pre-travel PCR test reduce the number of infectious days from 8357 to 5401 (3917-8677), a reduction of 36% (29-41) compared with the base case, and identified 569 (88% [ 76-92]) of 649 actively infectious travelers on the day of flight, the addition of post- travel quarantine and PCR reduced the number of infectious

---

[34] Chin, et. al, Journal of Clinical Infectious Diseases, *Frequency of Routine Testing for Coronavirus Disease 2019 (COVID-19) in High-risk Healthcare Environments to Reduce Outbreaks*, (Oct. 26, 2020), available at https://academic.oup.com/cid/article/73/9/e3127/5939986.

[35] *Id.*

[36] King, et. al, The Lancet, *Routine asymptomatic testing strategies for airline travel during the COVID-19 pandemic: a simulation study*, (July 2021), available at https://www.thelancet.com/journals/laninf/article/PIIS1473-3099(21)00134-1/fulltext.

days to 1474 (1087-2342) a reduction of 82% (80-84) compared with the base case."[37]  Kiang et al concluded that routine asymptomatic testing for SARS-CoV-2  before travel can be an effective strategy to reduce passenger risk of infection during travel, although abbreviated quarantine with post travel testing is probably needed to reduce population level transmission due to importation of infection when traveling from a high to low incidence setting."[38]

f.    **Quarantining as an Accommodation Option.** Quarantining when symptomatic is a cornerstone of disease prevention strategies.[39] In a meta-analysis evaluating the efficacy of COVID-19 countermeasures found that quarantining individuals when symptomatic, particularly within the first three days of symptom onset, was highly effective in reducing transmission.[40] As such, quarantining when symptomatic is a particularly effective method of preventing infection and transmission, particularly in cases where an employee has a low frequency if in-person interactions and has the benefit of time between interactions to observe potential symptomatic disease and quarantine accordingly. When coupled with regular testing, symptomatic quarantine protocol will certainly provide a superior form of preventing infection than a vaccination policy that does not implement regular testing and quarantine protocols for vaccinated employees, who may or may not have received a booster dose.

---

[37] *Id.*

[38] *Id.*

[39] *See* Talic, et. al, *Effectiveness of public health measures in reducing the incidence of covid-19, SARS-CoV-2 transmission, and covid-19 mortality: systematic review and meta-analysis*, BMJ (Nov. 18, 2021), available at https://www.bmj.com/content/375/bmj-2021-068302.

[40] *See* Girum, et. al, *Optimal strategies for COVID-19 prevention from global evidence achieved through social distancing, stay at home, travel restriction and lockdown: a systematic review,* Archives of Public Health (Aug. 2021), available at https://pmc.ncbi.nlm.nih.gov/articles/PMC8380106/pdf/13690_2021_Article_663.pdf.

g. **Masking as an Accommodation Option.** Additionally, masking alone, if utilized correctly, would be a superior countermeasure in terms of preventing infection and transmission than a standalone vaccination program, particularly for an individual in Plaintiff's role that does not have frequent in-person contact. Notably, CDC states that masking is a desirable countermeasure that lowers the risk of transmission.[41] Masking of an infected individual whether or not the individual is symptomatic reduces transmission risk. The effectiveness and the utility of face masks in workplace settings to reduce viral transmission is a very important topic with respect to this case. Several salient lines of evidence were available in 2021 on this topic, all of which demonstrated the high degree to which wearing face masks prevented transmission of the SARS-CoV-2 pandemic virus. A very thorough and comprehensive review on the topic of facemasks against COVID-19 was published in January 2021 by Jeremy Howard and colleagues.[42] These investigators developed an analytical framework to examine facemask usage, synthesizing all of the relevant literature to inform multiple areas, including population impact, transmission characteristics, source control, wearer protection, sociological considerations, and implementation considerations.[43] Howard and colleagues concluded "our review of the literature offers evidence in favor of widespread mask use as source control to reduce community transmission…"[44] These authors also state that masks are particularly effective in reducing transmission from person to person, especially from asymptomatic or presymptomatic individuals.[45] Finally these authors

---

[41] *See* CDC, *Masks and Respiratory Virus Prevention*, *available at* https://www.cdc.gov/respiratory-viruses/prevention/masks.html.

[42] *See* Howard et. al, PNAS, *An evidence review of face masks against COVID-19*, (Jan. 11, 2021), available at https://www.pnas.org/doi/10.1073/pnas.2014564118.

[43] *Id.*

[44] *Id.*

[45] *Id.*

conclude "when used in conjunction with widespread testing, contact tracing, quarantining of anyone that may be infected, handwashing, and physical distancing, facemasks are a valuable tool to reduce community transmission."[46]

Additional scientific literature published before Plaintiff was terminated demonstrates that masking meaningfully reduces the likelihood of infection and transmission. In a study authored by Kollepara and colleagues, the researchers conducted a meticulous analytic approach which they described as a threshold based dose response curve framework, and used it to analyze the effects of interventions on infection probabilities for exposure events.[47] The authors concluded that the empirical evidence indicates that masks prevent transmission of COVID-19, and the study concluded that "the framework demonstrates that masks can have a disproportionately large protective effect, and that more frequently wearing a mask provides super-linearly compounding protection. This work shows (1) that both the theoretical and empirical evidence is consistent with masks protecting against respiratory infections and (2) that non-linear effects and statistical considerations regarding the percentage of exposures for which masks are worn must be taken into account when designing empirical studies and interpreting their results."[48]   The work by Kollepara et al represent compelling and reliable evidence that face masks effectively prevent SARS-CoV-2 viral transmission from person to person.

Further, in March of 2021, a publication authored by John T. Brooks and Jay C. Butler of the CDC was published in the Journal of the American Medical Association that supports that

---

[46] *Id.*

[47] Kollepara et. al, PubMed, *Unmasking the mask studies: why the effectiveness of surgical masks in preventing respiratory infections has been underestimated,* (Sept. 2021), available at https://pmc.ncbi.nlm.nih.gov/articles/PMC8499874/.

[48] *Id.*

masking can have a meaningful impact reducing the rates of infection and transmission.[49]  In this reliable paper, Drs. Brooks and Butler concluded "community mask wearing substantially reduces transmission of SARS-CoV-2 in two ways. First, masks prevent infected persons from exposing others to SARS-CoV-2  by blocking exhalation of virus-containing droplets into the air (termed source control). This aspect of mask wearing is especially important because it is estimated that at least 50% or more of transmissions are from persons who never develop symptoms or those who are in the presymptomatic phase of COVID-19 illness."[50]  The authors further highlight the reality that "masks can also partially filter out small droplets and particles from inhaled air."  These authors cite a reference pertaining to an outbreak on a US naval vessel (the USS Theodore Roosevelt), where it was demonstrated that persons who wore masks experienced a 70% lower risk of testing positive for SARS-CoV-2 infection.[51]

h.    **Natural Immunity as an Accommodation Option.** Demonstrating proof of natural immunity alone—in terms of preventing infection and transmission for an individual in Plaintiff's role—is a more effective countermeasure than vaccination. Recognizing natural immunity as accommodation option that would noticeably reduce the rates of infection and transmission, as well as having the additional benefit of providing personal protection against severe outcomes for the individual. Naturally acquired immunity against viruses has proven to be the most reliable and effective path out of a pandemic. While it would be nonsensical for a company to require one to obtain natural immunity to maintain employment, it is equally nonsensical to disregard already acquired natural immunity as an alternative to vaccination.

---

[49] Brooks et. al, JAMA, *Effectiveness of Mask Wearing to Control Community Spread of SARS-CoV-2,*  , (March 9, 2021), available at  https://pmc.ncbi.nlm.nih.gov/articles/PMC8892938/pdf/nihms-1780411.pdf.

[50] *Id.*

[51] *Id.*

Naturally acquired immunity can be assumed in a person with a well-documented/medically validated history of rapid antigen positive or PCR test positive COVID-19, and can also be demonstrated empirically by way of serum antibody testing.

The international scientific community has conclusively established through centuries of research that natural immunity is superior to vaccine-elicited immunity.[52] This should be unsurprising given that vaccine-based immunization is an artificial attempt to emulate the mechanisms of natural immunity. Mucosal immune responses occur with natural infection whereas they do not with a parenterally administered vaccine injection.

In the context of COVID-19, natural immunity's desirable relative efficacy has been repeatedly confirmed in the scientific literature and by reputable sources.[53] As expected, the CDC has documented that natural immunity provides robust and durable protection against COVID-19.[54] During the relevant timeframe, the CDC confirmed that individuals with natural immunity exhibited greater protection against viral variants than vaccinated individuals.[55]

---

[52] *See, e.g.,* Plotkin's Vaccines, 7th Edition, at Section 2.

[53] *See, e.g.,* THE LANCET, *Past SARS-CoV-2 infection protection against re-infection: a systematic review and meta-analysis* (Feb. 16, 2023), *available at* https://www.thelancet.com/article/S0140-6736(22)02465-5/fulltext.; *see also* Pubmed, *Quantifying the risk of SARS-CoV-2 reinfection over time,* (May 27, 2021), Murcho et. al, available at https://pubmed.ncbi.nlm.nih.gov/34043841/; Journal of Clinical Infectious Diseases, *Necessity of COVID-19 vaccination in previously infected individuals,* (June 5, 2021), Shrstha, et. al, available at https://www.medrxiv.org/content/10.1101/2021.06.01.21258176v2; World Health Organization, "COVID-19 natural immunity", May 10, 2021, available at https://iris.who.int/bitstream/handle/10665/341241/WHO-2019-nCoV-Sci-Brief-Natural-immunity-2021.1-eng.pdf?sequence=3&isAllowed=7.

[54] *See, e.g.,* CDC MORBIDITY AND MORTALITY WEEKLY REPORT, Jan. 19, 2022, *COVID-19 Cases and Hospitalizations by COVID-19 Vaccination Status and Previous COVID-19 Diagnosis – California and New York, May-November 2021* ("By early October [2021], persons who survived a previous infection [and therefore possessed natural immunity] had lower case rates than persons who were vaccinated alone.") *Available at* https://archive.cdc.gov/#/details?url=https://www.cdc.gov/media/releases/2022/s0120-covid-19-cases.html.

[55] *Id.*

In fact, natural protection against COVID-19 was already evident in the original Pfizer COVID-19 vaccine trial. In that trial, there were 567 patients in the placebo group and 526 patients in the vaccine group who had evidence of prior COVID-19 infection. In each of these subgroups, there was only one reinfection according to the primary endpoint definition.[56] In other words, of 567 patients in the placebo group who had evidence of prior COVID-19 infection, only one developed reinfection. Similarly, out of 526 patients in the vaccine recipient group with documented prior COVID-19 infection, only one patient developed a reinfection. This compares to 162 infections out of 16,944 placebo recipients with no evidence of prior COVID-19 infection. Said another way, those with prior infection had at least a 100-fold lower rate of reinfection than those with no prior infection during the Pfizer trial period.

A very important consideration with respect to workplace policies has to do with the degree to which natural immunity following infection (as opposed to immunity conferred via vaccination) provides protection against re-infection. By the time Defendant terminated Plaintiff in late 2021, the strength of natural immunity as protection against COVID-19 had been well established in reliable scientific literature.

In 2021, an important and highly influential paper was published by some of the top experts at the Cleveland Clinic.[33] These authors concluded that "cumulative incidence of COVID-19 was examined among 52,238 employees in an American healthcare system. COVID-19 did not occur in anyone over the five months of the study among 2579 individuals previously infected with COVID-19, including 1359 who did not take the vaccine."[57] The investigators determined prior infection status by way of confirmatory molecular testing. These authors went on to state in their

---

[56] FDA - *Vaccines and Related Biological Products Advisory Committee December 10, 2020 Meeting Briefing Document*, *available at* https://www.fda.gov/media/144245/download (Table 8, page 27).

[57] *Id.*

conclusions "individuals who have had SARS-CoV-2 infection are unlikely to benefit from COVID-19 vaccination, and vaccines can be safely prioritized to those who have not been infected before."[58]

The efficacy of prior infection and recovery was also addressed in an important publication that appeared in May, 2021 from authors in Dublin Ireland.[59] The authors conducted the first systematic review which synthesized the evidence on the risk of SARS-CoV-2 infection over time. In this highly powered study, the researchers conducted a review of 11 cohort studies involving over 600,000 total recovered COVID-19 patients who were followed up with for over 10 months and found that reinfection in all studies was "an uncommon event" and explained that there was "no study reporting an increase in the risk of reinfection over time."[60] The authors summarized that "a standardized protocol was employed, based on Cochrane methodology. Electronic databases and preprint servers were searched from 1 January 2020 to 19 February 2021. Eleven large cohort studies were identified that estimated the risk of SARS-CoV-2 reinfection over time, including three that enrolled healthcare workers and two that enrolled residents and staff of elderly care homes. Across studies, the total number of PCR-positive or antibody-positive participants at baseline was 615,777, and the maximum duration of follow up was more than 10 months in three studies. Reinfection was an uncommon event (absolute rate 0% - 1.1%) with no study reporting an increase in the risk of re-infection over time. Only one study estimated the population level risk of re-infection based on whole genome sequencing in a subset of patients; the estimated risk was low (0.1% [95% CI 0.08-0.11%]) with no evidence of waning immunity for up to seven months

---

[58] *Id.*

[59] *See* Murcho et. al, *Quantifying the risk of SARS-CoV-2 reinfection over time,* (May 27, 2021), available at https://pubmed.ncbi.nlm.nih.gov/34043841/.

[60] *Id.*

following primary infection. These data **suggest that naturally acquired SARS-CoV-2 immunity does not wane for at least 10 months post infection**."[61]

Reliable literature also established that natural immunity provided protection against severe, critical, and fatal reinfection.[62] More importantly, natural immunity demonstrates a broader and more durable immune response, including mucosal immunity.[63]

These findings should not be surprising given that vaccines, by design, are, again, an artificial attempt to emulate the immunity created by a natural infection.[64] Vaccines generally never achieve the same level of protection afforded by natural infection from a virus.[65] Through centuries of research, the scientific community has confirmed that vaccines universally confer inferior immunity to having had the actual virus, and even the best vaccines do not confer immunity to all recipients.[66] In those who do obtain simulated immunity from vaccination, the immunity created wanes more rapidly over time,[67] as has been repeatedly demonstrated in the case of the COVID-19 vaccines.

In fact, individuals who had recovered from SARS-CoV-1 in the early 2000's still had reactive T-cell immunity to SARS-CoV-1 seventeen years later, and importantly, these cells also

---

[61] *Id.* (emphases added).

[62] *See* Suppl to: Lin D-Y, Gu Y, Xu Y, et al., *Effects of vaccination and previous infection on omicron infections in children*. NEW ENGLAND JOURNAL OF MEDICINE, DOI: 10.1056/NEJMc2209371, plot of data from Tables S5 & S6, *available at* https://www.nejm.org/doi/suppl/10.1056/NEJMc2209371/suppl_file/nejmc2209371_appendix.pdf.

[63] Cohen et. al, PubMed, *Longitudinal analysis shows durable and broad immune memory after SARS-CoV-2 infection with persisting antibody responses and memory B and T cells,* (July 2021), *available at* https://pubmed.ncbi.nlm.nih.gov/34250512/.

[64] *See* Plotkin's Vaccines, 7th Edition, at Section 2.

[65] *Id.*

[66] *Id.*

[67] *Id.*

generated an immune response to SARS-CoV-2 seventeen years later, demonstrating the durability, persistence, and breadth of natural immunity against SARS-type viruses.[68]

  **i.**   **Other safety protocols as an accommodation option.** Observing other safety protocols in Mr. Secker's case—such as social distancing, handwashing, temporary telework, or swapping schedules with an employee Defendant was comfortable with engaging in interpersonal contact in the even Mr. Secker's job required him to engage in in-person work—are also strategies and accommodation options that would have meaningfully reduced infection risks. Teleworking and schedule swapping are obvious options as one cannot spread if they have no contact with another person. Further, research published in January 2021 by Jeremy Howard and colleagues[69] concluded that when used in conjunction with testing, contact tracing, handwashing, and physical distancing are valuable tools "to reduce community transmission."[70]

  39. In sum, Mr. Secker could have been accommodated by utilizing alternatives to vaccination that would have significantly reduced the risk of transmission. Critically, because the COVID-19 vaccines are non-sterilizing, and certainly do not prevent transmission, the enhanced safety protocols described above should have applied to vaccinated and unvaccinated employees alike if Defendant was truly committed to minimizing the spread of COVID-19.

  When these accommodation options are stacked by an unvaccinated individual (especially one who has infrequent contact with others as part of his role), that individual would certainly pose a lesser transmission risk than employee who was vaccinated but not observing such safety

---

[68] Hellerstein, et. al, PubMed, *What are the roles of antibodies versus a durable, high quality T-cell response in protective immunity against SARS-CoV-2?* (Aug. 2020), *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC7452821/.

[69] *See* Howard et. al, PNAS, *An evidence review of face masks against COVID-19*, (Jan. 11, 2021), available at https://www.pnas.org/doi/10.1073/pnas.2014564118.

[70] *Id.*

measures.

40.  **Issue Addressed by Dr. Salmon:** In the Relevant Time Period, was it known or assumed that a vaccinated person could not, or was less likely to, transmit the disease to others?

**Salmon Opinions:** "It was known at this time that a vaccinated person would be less likely than an unvaccinated person to transmit disease. In the case of COVID-19 vaccines, as is often the case with infectious disease epidemiology and vaccination, risks must be considered on a continuum or level of risk rather than dichotomized into risk vs. no risk. As no vaccine is perfectly effective, it was possible for a vaccinated person to transmit disease. However, as stated, the risk of an individual transmitting disease was substantially reduced through vaccination." Salmon Report, at 5.

**Responses:**

a.  Dr. Salmon's opinion apparently assumes that any and all unvaccinated individuals would not adhere to enhanced safety protocols separate from vaccination. Thus, Dr. Salmon's opinion is not helpful to the critical issue in this case, which is the relative risk of an unvaccinated employee who had infrequent contact with others who was potentially observing enhanced safety protocols compared to an employee who was vaccinated. Of critical importance to this inquiry is that, well before Plaintiff was terminated, the CDC confirmed that the COVID-19 vaccines were incapable of preventing infection and transmission of COVID-19.[71] In fact, the CDC publicly announced that, after the Delta variant appeared and became the dominant variant in the summer of 2021, that vaccinated and unvaccinated persons demonstrated "similarly high SARS-CoV-2 viral loads", indicating that "vaccinated people infected with Delta can transmit the virus", and therefore recommended that vaccinated persons observe enhanced safety protocols, such as

_____

[71] *See* Exhibit 3, Statement from CDC Director (July 30, 2021).

masking.[72] As such, if Defendant's goal was to reduce the incidence of infection and transmission, it would have required enhanced safety protocols such as testing, masking, social distancing, strict quarantine when symptomatic policies, etc., for vaccinated and unvaccinated employees alike. And, again, an unvaccinated employee observing these safety protocols would certainly have been less likely to contract and spread COVID-19 than a vaccinated but un-boosted employee who was not observing the same measures.

   b.    Dr. Salmon's opinion that it "was known at [the relevant period] that a vaccinated person would be less likely than an unvaccinated person to transmit disease" demands special scrutiny. The COVID-19 vaccines were never tested during the clinical trials to determine whether they were capable of stopping transmission and spread of SARS-CoV-2. The trials themselves were never designed to test for preventing transmission. Pfizer explicitly pointed this out to the FDA.[73] When the FDA issued the Emergency Use Authorization for Pfizer's COVID-19 vaccine in December 2020, the FDA disclosed that there was no "evidence that the vaccine prevents transmission of SARS-CoV-2 from person to person."[74]

   Further, the "data gaps" identified by Pfizer and quoted in the EUA directly contradict any position that the vaccines were confirmed as capable of preventing infection and transmission of SARS-CoV-2. Pfizer identified, inter alia, the following data "gaps" in the trials:

   i.    Duration of protection;

   ii.   Vaccine effectiveness against asymptomatic infection;

---

   [72] *See* Exhibit 3.

   [73] Pfizer-BioNTech COVID-19 Vaccine EUA Amendment Review Memorandum 05262021, *available at* https://www.fda.gov/media/148542/download#page=38.

   [74] See FDA Takes Key Action in Fight Against COVID-19 By Issuing Emergency Use Authorization for First COVID-19 Vaccine, Dec. 11, 2020, available at https://www.fda.gov/news-events/press-announcements/fda-takes-key-action-fight-against-covid-19-issuing-emergency-use-authorization-first-covid-19\.

iii.     Vaccine effectiveness against transmission of SARS-CoV-2.[75]

Additionally, the emergence of COVID-19 variants further exposed the lack of efficacy of the vaccines in reducing COVID-19 rates of infection and transmission. As the SARS-Cov-2 virus mutated and as new viral variants emerged, the virus' ability to undergo "immunological escape" increased markedly thereby making the vaccines progressively less efficacious compared to when they were first made available (December 2020, the first case of the "Alpha" variant in the US was identified, and in January 2021, "Beta" and "Gamma" variants were also detected in the US. The "Delta" variant was shown to be the dominant variant in the United States in 2021, and by late November/early December 2021, the "Omicron" variant emerged as the dominant variant).

The COVID-19 vaccines were tested and authorized when the Alpha variant was dominant, and the vaccines obviously were not tested in placebo-controlled randomized trials against the emergent variant viruses, nor were any controlled trials conducted to examine vaccine efficacy in preventing transmission of variant strains of COVID-19. With the emergence of the Delta variant in the Summer of 2021 and the Omicron variant in the Fall/Winter of 2021, it became abundantly clear that any claimed vaccine efficacy against prevention of infection, severe outcomes, and transmission was unsupportable.

There are two fundamental factors that contributed to the lack of efficacy of the COVID-19 vaccines. The first factor was simple waning of antibody levels following vaccination. This phenomenon is well known to occur with all vaccines, but when a new vaccine is first introduced, the rate of decay or waning of antibody levels is unknown.  The second factor that specifically contributed to reductions in observed vaccine efficacy in the case of COVID-19 had to do with the

---

[75] *See* Pfizer-BioNTech COVID-19 Vaccine EUA Amendment Review Memorandum 05262021, *available at* https://www.fda.gov/media/148542/download#page=38 (emphasis added).

extraordinarily rapid rate of pandemic virus mutation, and emergence of new viral variants of the SARS-CoV-2 virus. Taken together, these two considerations pose severe impediments to persistence of COVID-19 vaccine efficacy.

Ramesh and colleagues (Ramesh et al, 2021) document in a very thorough manner the emergence of multiple SARS-CoV-2 variants during 2020 and 2021, and they also review the implications of the emergence of these viral variants on vaccine efficacy. These authors document that the CDC had classified pandemic viruses into variants of interest, variants of concern, and variants of high consequence. At the time of the Ramesh publication, there were four variants of concern, and at least three variants of interest characterized. Ramesh and colleagues document the timelines of emergence of these variants, and also present in tabular form the important point that vaccine efficacy was observed to be progressively lower with the emergence of each new viral strain or variant. It must be pointed out also that vaccine efficacy against new variants was unknown for various periods of time when these new viral subtypes first emerged, and before any vaccine efficacy assessments could be conducted. Ramesh and his co-authors conclude in their paper "to date, studies indicate that the effectiveness of the currently available vaccines may be reduced against SARS-CoV-2 variants." The various vaccines and their clinical efficacy against the variants of concern are described and briefly summarized in Table 5 of the paper, and lower vaccine efficacy levels are seen with each novel variant over the timelines of their respective appearance.

Moreover, public health authorities recognized early on that any protection afforded by the COVID-19 vaccines wanes rapidly, as demonstrated by the CDC's repeated recommendations for regular booster shots, including such guidance in the Fall of 2021. However, it is important to highlight that the SARS-Cov-2 virus' rate of mutation far surpassed the speed with which the

major vaccine manufacturers' were able to update or modify their vaccines' mRNA coding, and therefore boosters of vaccine consisted of outdated strains, affording little in the way of protection with each booster.

Thus, from public filings and readily available public scientific literature, it was clear before and soon after the COVID-19 vaccine rollout that the vaccines were not capable of preventing infection, especially asymptomatic infection, and transmission of COVID-19.  By mid-2021, real world evidence, anecdotal cases, and public pronouncements by health authorities further confirmed that the vaccines were incapable of stopping infection and transmission of the virus. *See* fns. 5-10 above. And again, as additional confirmatory evidence demonstrating that vaccinated individuals were entirely capable of being infected and transmitting the virus, on August 6, 2021, the then head of the CDC, Rochelle Walensky, publicly announced that the COVID-19 vaccines worked "with regard to severe illness and death . . . [b]ut what they c[ouldn]'t do anymore is prevent transmission." [76] Further, in August of 2021, a reliable joint study by the CDC and the Wisconsin Department of Health Services provided further evidence substantiating Director Walensky's statement—the study indicated that vaccinated individuals had a 5% higher viral load than the unvaccinated.

Further, a reliable October 2021 study published in the Lancet further confirmed that COVID-19 vaccines were incapable of stopping transmission of COVID-19 and, in fact, the transmission rate within the vaccinated cohort was observed to be greater than the transmission rate for the unvaccinated cohort. [77]

---

[76] *See* CNN, *Fully Vaccinated People Who Get a Breakthrough Infection Can Transmit the Virus,* (Aug. 5, 2021), *available at* https://edition.cnn.com/us/live-news/coronavirus-pandemic-vaccine-updates-08-05-21/h_d2accec79fdc37f422d02c536828ea1e.

[77] *See* Singanayagam et al., *Community transmission and viral load kinetics of the SARS-CoV-2 delta (B.1.617.2) variant in vaccinated and unvaccinated individuals in the UK: a prospective, longitudinal, cohort study,* The Lancet (Oct. 29, 2021), *available at*

Given that (a) the vaccines' level of protection for the individual recipient wanes over time, and (b) that vaccinated individuals are fully capable of becoming infected, especially so with asymptomatic infection, and that, (c) when infected, they carry high viral loads (*see* Exhibit 3, and footnote 13, above), vaccinated individuals pose a very substantial risk of transmission in the workplace.

Considering the foregoing, it was publicly known during the relevant timeframes that the COVID-19 vaccines were incapable of preventing infection and transmission, and that any claimed vaccine efficacy wanted rapidly. Thus, an employer wishing to reduce the incidence of infection and transmission and infection within its workforce (and to reduce risks to customers and clients) would implement quarantine and enhanced safety protocols to apply with equal force to those who vaccinated and unvaccinated alike, particularly for vaccinated employees who are more than six months out from their second mRNA dose (or more than 2 months after the J&J vaccine).

41.    **Issue Addressed by Dr. Salmon:** **In the Relevant Time Period, was it reasonable for Epic to rely on guidance from the CDC regarding COVID-19 and vaccinations? What was that guidance, in particular for workers at healthcare facilities?**

**Salmon Opinions:** "It was reasonable, and in fact scientifically and programmatically appropriate, for Epic to rely on CDC guidance regarding COVID-19 and vaccination. The CDC is a federal agency within the Department of Health and Human Services (HSS) responsible for protecting the health of the American public. As the premiere public health agency for the country, and a model for the rest of the world, the CDC has a long history of expertise in epidemiology and the application of science to control infectious and chronic diseases. CDC provided the most science driven guidelines at a time when misinformation and disinformation was rampant. The

---

https://www.thelancet.com/journals/laninf/article/PIIS1473-3099(21)00648-4/fulltext.

CDC held meetings of its Advisory Committee on Immunization Practices (ACIP) in which the most current data on COVID-19 and the safety and effectiveness of COVID-19 vaccines were publicly reviewed by national and international experts and vaccine recommendations were made from ACIP to CDC. CDC had ultimate authority to accept or reject ACIP recommendation. However, the CDC generally relies on the ACIP for decision-making in these areas and accepts and implements ACIP recommendations." Salmon Report, at 7.

**Responses:** This opinion is overly broad as to the critical issues in this case, lacks necessary nuance, and therefore is not helpful to the critical issue in this case – whether Mr. Secker could have been accommodated without sacrificing safety. For the reasons detailed throughout, Mr. Secker unquestionably could have been safely accommodated.

a.    Whether an employer's reliance on CDC guidance, generally speaking, is not disputed. But the full range of CDC guidance and publicly available contemporaneous scientific literature should inform whether an employee with religious objections to vaccination could have been safely accommodated, or should have been fired due to supposed unacceptable safety risks posed by his or her vaccination status. Again, Mr. Secker could have been safely accommodated through a variety of methods without posing an increased transmission risk relative to a vaccinated colleague. *See* full discussion, at pp. 16-31, above.

b.    It is also imperative to distinguish CDC guidance directed for HCWs from more general guidance to non-HCWs, and to not conflate all individuals who might in the course of their employment occasionally enter a health care facility with an actual, formal HCW. And again, the full range of CDC proclamations and guidance should be integrated into examining whether Mr. Secker could have been accommodated without sacrificing workplace safety, which he could have been. While an employer was well within its rights to implement and maintain a vaccination

37

mandate relying upon CDC guidance, feasibility of alternatives to vaccination should have been considered in light of CDC and other public health information.  Again, during the relevant timeframe, the CDC Director made clear that COVID-19 vaccines did not stop transmission and infection of COVID-19; on August 6, 2021, the then head of the CDC, Rochelle Walensky, publicly announced that the COVID-19 vaccines worked "with regard to severe illness and death . . . [b]ut what they c[ouldn]'t do anymore is prevent transmission."[78]

Importantly, CDC guidance regarding healthcare facilities focused on frontline employees working in health care facilities full-time, with significant in-person, close contact with patients. It is my understanding that Mr. Secker was not a formal HCW, and did not regularly interact with patients and the public. Thus, such CDC guidance would be inapplicable to his situation (as Dr. Salmon erroneously suggests should be the case).  In any event, Mr. Secker could have been safely accommodated even if he were an actual HCW with patient contact.

42.    **Issue Addressed by Dr. Salmon: Based on Mr. Secker's position, which required him to travel to healthcare facilities to work side by side with the healthcare facilities' employees, including healthcare providers, what risks did he pose carrying out his duties unvaccinated as known or assumed as of the Relevant Time Period?** Salmon Report, at 11.

**Salmon Opinion:** "As discussed, unvaccinated persons were at increased risk compared to vaccinated persons of acquiring and transmitting COVID-19. Consequently, an unvaccinated EPIC employee who worked side by side with others in healthcare facilities including healthcare providers would be at increased risk (compared with a vaccinated EPIC employee) of transmitting COVID-19 to these healthcare workers. Additionally, even if an EPIC unvaccinated employees did not come into direct contract with patients, their increased risk could increase the risk to

---

[78] *See* CNN, *Fully Vaccinated People Who Get a Breakthrough Infection Can Transmit the Virus,* (Aug. 5, 2021), *available at* https://edition.cnn.com/us/live-news/coronavirus-pandemic-vaccine-updates-08-05-21/h_d2accec79fdc37f422d02c536828ea1e.

patients either because they infected another healthcare worker who then infected a patient or if the unvaccinated EPIC employee was in a room, hallway or elevator that a patient later entered as COVID-19 could be transmitted after the patient touched surfaces or objects that had been contaminated with the virus by the unvaccinated EPIC employee. Patient family members could also be infected by an unvaccinated EPIC employee in the same manner." Salmon Report, at 11.

**Responses:**

a.     Dr. Salmon's opinion again fails to confront the specifics and the key issue of this case – whether Mr. Secker could have been accommodated through observing enhanced safety protocols, and whether in such a case he would have posed an equal or lesser risk to a vaccinated employee. Again, Mr. Secker could have been safely accommodated. *See* discussion, pp. 16-31, above.  Notably, public health authorities recognized early on that any protection afforded by the COVID-19 vaccines wanes rapidly, as demonstrated by the CDC's repeated recommendations for regular booster shots, including such guidance in the Fall of 2021.[79]  It is also important to highlight that the SARS-Cov-2 virus' rate of mutation far surpassed the speed with which the major vaccine manufacturers' were able to update or modify their vaccines' mRNA coding, and therefore boosters of vaccine consisted of outdated strains, affording little in the way of protection with each booster. As such, any claimed burden of accommodating is necessarily premised on the efficacy of the medical procedure it mandated, and must be measured against alternative and more reliable transmission reduction countermeasures.

---

[79] *See* CDC*, CDC Expands COVID-19 Booster Recommendations,* (November 29, 2021), *available at* https://archive.cdc.gov/www_cdc_gov/media/releases/2021/s1129-booster-recommendations.html#:~:text=Today%2C%20CDC%20is%20strengthening%20its%20recommendation%20on%20booster,or%202%20months%20after%20their%20initial%20J%26J%20vaccine.

It must be noted that Dr. Anthony Fauci addressed the "short-lived" protection and inability of vaccines to stop infection and transmission of respiratory viruses. However, as variant SARS-CoV-2 strains have emerged, deficiencies in these [COVID-19] vaccines reminiscent of influenza vaccines have become apparent. The vaccines for these two very different [mucosal respiratory] viruses have common characteristics: **they elicit incomplete and short-lived protection against evolving virus variants that escape population immunity** … Taking all of these factors into account, it is not surprising that none of the predominantly **mucosal respiratory viruses have ever been effectively controlled by vaccines.** [80]

Dr. Salmon also fails to address risks associated with vaccinated persons—who may or may not be boosted—who can exhibit a false sense of security and enhanced likelihood of social behaviors such as publicly intermingling while symptomatic due to a false sense of security regarding the capabilities of vaccines at issue. *See* pp. 16-31, and fn. 28, above.

Moreover, published research from the Cleveland Clinic concluded that the risk of contracting COVID-19 increases with the number of vaccine doses received.[81] As such, while vaccinated persons may gain a waning personal benefit from becoming vaccinated, based on the Cleveland Clinic findings, they would potentially be subjected to an increased risk of reinfection depending on the number of booster doses they have received. These findings must also be incorporated into any analysis of whether Mr. Secker posed an unacceptable transmission risk

---

[80] *See* Fauci et. al, CELL HOST & MICROBE, *Rethinking next-generation vaccines for coronaviruses, influenzaviruses, and other respiratory viruses* (January 11, 2023), *available at* https://www.cell.com/cell-host-microbe/fulltext/S1931-3128(22)00572-8 (emphasis added).

[81] *See* Nabin K. Shrestha *et. al.,* MedRxiv, *Effectiveness of Coronvirus Disease (COVID-19) Bivalent Vaccine,* (Dec. 19, 2022), *available at* https://www.medrxiv.org/content/10.1101/2022.12.17.22283625v1 (in comprehensive study, researchers found the risk "of COVID-19 increased with time since the most recent prior COVID-19 episode **and with the number of vaccine doses previously received**") (emphasis added).

40

relative to his vaccinated/boosted colleagues. The Cleveland Clinic findings provide additional support for why Mr. Secker could have been accommodated through alternative, more reliable COVID-19 countermeasures.

      b.    Considering that the vaccines are incapable of preventing infection and transmission, and demonstrated vaccine inefficacy against variants, the primary benefit of the COVID-19 vaccines is for potential personal protection for the individual recipient, and more specifically for those at risk of experiencing a severe COVID-19 outcome. Those at most risk of experiencing a severe or fatal case of COVID-19 are the elderly and those with underlying medical impairments.[82] Because the COVID-19 vaccines are incapable of fully preventing or blocking infection and transmission of COVID-19, it is my opinion that the primary benefit of the COVID-19 vaccines may be for personal protection in high-risk individuals.

      c.    Considering the foregoing, I disagree with the opinion that Mr. Secker posed any additional or unacceptable risks compared to a vaccinated employee when completing his job duties, particularly if Mr. Secker observed one or more of the enhanced alternative safety measures discussed throughout.

      43.    **Issue Addressed by Dr. Salmon: Mr. Secker worked on the Continuing Care Clinicals team, which provides support in a variety of healthcare settings, including home health, hospice, and long-term care. Would the risks identified in response to question no. 6 be particularly acute based upon the healthcare facilities Mr. Secker would be assisting?** Salmon Report, at 11-12.

**Salmon Opinion:** "Because patients in home health, hospice and long-term care facilities tended to be older and have one or many comorbidities, the impact of an unvaccinated EPIC

---

[82] *See* Kompaniyets L., et. al., Underlying Medical Conditions and Severe Illness Among 540,667 Adults Hospitalized With COVID-19, March 2020-March 2021, available at https://pubmed.ncbi.nlm.nih.gov/34197283/; see also Axfors, C., Ioannidis, JPA, Eur J Epidemiol., Infection fatality rate of COVID-19 in community-dwelling elderly populations.. (Mar 20, 2022), available at https://pubmed.ncbi.nlm.nih.gov/35306604/.

employee working in these settings would be especially relevant because the underlying patient population would have been extremely vulnerable." Salmon Report, at 11-12.

**Responses:**

a.    Dr. Salmon fails to address that vaccinated employees, especially those with an asymptomatic infection attributable to vaccination-based protection, were just as likely if not more likely to spread COVID-19 to an  older person or one or many comorbidities than Mr. Secker.  Further, Mr. Secker, as I understand, did not routinely work on a regular basis in a traditional healthcare setting, as this question implies. Even if he had direct patient contact— which I understand he did not—he could have been accommodated without posing a greater threat to patients or to vulnerable populations relative to his vaccinated colleagues, especially those who were not testing regularly and receiving regular booster shots.  Regardless, Plaintiff was not a HCW, and was not an employee who had regular contact with the public. As I understand Mr. Secker's job role, he was not required as part of his job duties to speak with patients, enter patients' private rooms, examine patients, touch patients, move patients or physically come in direct contact with patients.

b.    Moreover, the risks discussed above could have been mitigated, as discussed throughout this Rebuttal Report, by layering enhanced safety protocols. In fact, layering enhanced safety protocols while unvaccinated was a superior way to reduce transmission and infection risks than vaccination, particularly if the vaccinated employee was not observing enhanced safety protocols. Again, there are a variety of countermeasures that reduce transmission risks to an equal or greater degree than vaccination. *See* pp. 16-31, above. When combined, such countermeasures provided a significantly greater risk reduction protocol than vaccination alone.

44.    Because the COVID-19 vaccines were and are incapable of preventing infection and transmission of COVID-19, and in light of at least one study that indicated that the risk of infection increases with the number of doses received, it is my professional opinion that regular testing, masking, combined with quarantining when exposed or when symptomatic, and/or recognition of natural immunity (which it is my understanding that Plaintiff believes he possessed before he was terminated) represents a more reliable way to assure prevention of spread in high density settings than rigidly imposed, standalone, universal vaccination policy that does not integrate the additional safety protocols discussed in this report.

45.    **Issue Addressed by Dr. Salmon: During the Relevant Time Period, was in known or assumed that masking, social distancing (to the extent possible) and periodic testing would have minimized the risk Mr. Secker posed to healthcare facilities' employees, to the same extent being fully vaccinated against COVID-19 would have?** Salmon Report, at 13-14.

**Salmon Opinions:** "In addition to vaccination, alternative infection control strategies such as masking, social distancing, and periodic testing had an impact in health care institutions. However, each of these strategies had limitations. The most effective policy to control COVID-19 in health care settings was a comprehensive approach where strategies were combined or layered. The use of masks in health care settings to prevent COVID-19 vaccine was based on what was known regarding mask wearing in health care settings to control influenza. Wearing a mask has a clear benefit in reducing the acquisition and transmission of influenza. Two studies have shown that surgical masks are similar to some types of respirators in protecting healthcare workers from acquiring influenza…However, wearing a surgical mask when treating patients in lieu of mandatory vaccination is problematic for many reasons. First and foremost, surgical masks do not work as well as vaccination which is why the Centers for Disease Control and Prevention (CDC) considers influenza vaccination the first and best way to prevent influenza. Additionally,

implementing a surgical mask policy in lieu of vaccination is problematic. Such a program requires oversight to ensure compliance. Doing so would be very difficult, particularly if only for employees who have forgone vaccination." Salmon Report, at 13-14.

**Responses:** Dr. Salmon, again, fails to address the key issue in this case – whether Mr. Secker could have been accommodated through methods alternative to vaccination that would have been an equal or lesser transmission reduction method than vaccination alone. There is no comparison of the risks between vaccination and non-pharmaceutical interventions, or conclusion that Mr. Secker posed a greater transmission risk if he had observed other safety protocols. Mr. Secker could have been accommodated through a variety of methods, and these methods, particularly when layered, are a more effective and reliable COVID-19 countermeasure than vaccination alone. *See* pp. 16-31. And Dr. Salmon's opinion that "implementing a surgical mask policy in lieu of vaccination is problematic" because it would require "oversight to ensure compliance" fails to address that a vaccination program requires oversight to ensure compliance (e.g., track vaccination rates, ensure employees are not faking vaccination cards, and ensuring that vaccination elicited a persistent immune response, etc.). He cites no authority to suggest that a masking program could not be successfully implemented, or that such a program would not meaningfully reduce infection and transmission rates. There is reliable research indicating to the contrary.

46.    **Issue Addressed by Dr. Salmon: On or about July 21, 2021, did the American Hospital Association call for all health workers to be vaccinated against COVID-19. See attached news clipping. The article indicates that the Association of American Medical Colleges, the Society for Healthcare Epidemiology of America, the Infectious Diseases Society of American were also in favor of requiring all health workers to be vaccinated against the virus. At the time, did you agree with their position?** Salmon Report, at 15-16.

**Salmon Opinions:** "At that time, I very much agreed with this statement and, in hindsight, remain supportive. For the reasons discussed in this report, unvaccinated healthcare personnel are

at increased risk of contracting and transmitting COVID-19 to other healthcare workers (who were critical to the health of the population and struggling to meet their responsibility to patients), patients and their families. Of note, an employee of EPIC who came into healthcare facilities would fall under this statement as they would be classified as nonemployees (of the hospital or healthcare setting) functioning at a healthcare facility. Most simply stated, if a worker is not willing to do what they can (including but not limited to vaccination) to limit the spread of a very dangerous infectious disease in a healthcare setting during a global pandemic they should not be working in a healthcare setting." Salmon Report, at 15-16.

**Responses:**

a.    As stated throughout, Plaintiff is not a traditional healthcare worker who worked full time in healthcare facilities with patient contact. As such, the AHA policy would not and should not apply to an information technology worker who sporadically visits health care facilities.

b.    Regardless, for the reasons stated throughout, even if Mr. Secker had been a formal HCW, he could have been safely and effectively accommodated through safety measures alternative to vaccination. Further, whether a vaccination mandate was advisable or preferred by the Association of American Medical Colleges, the Society for Healthcare Epidemiology of America, the Infectious Diseases Society of American is irrelevant to whether Mr. Secker could have been safely and effectively accommodated.

47.    **Issue Addressed by Dr. Salmon: What was known about the effectiveness of the vaccines during the Relevant Time Period?**

**Dr. Salmon Opinions:** "The most accurate estimates of the efficacy of COVID-19 vaccines at the time were based on the information available from the phase 3 clinical trials that were consider by the Food and Drug Administration (FDA) and its Vaccines and Related

Biological Product Advisory Committee (VRBPAC) which were made available to the public." Salmon Report, at 16.

**Responses:**

    a.    Vaccine "efficacy" requires a detailed explanation between relative risk reduction and absolute risk reduction. Absolute risk reduction measures the precise strength of the reduced risk, compared to relative risk reduction, which is a proportion of risk outcomes in separate groups. The absence of reported absolute risk reduction in COVID-19 vaccine clinical trials can lead to outcome reporting bias that affects the interpretation of vaccine efficacy.[83] The vaccines were often cited as being "effective" and "efficacious". Without explanation of that term, it was misleading in that such reports suggested they were efficacious against all infection and efficacious in preventing transmission. Again, the trials did not test for efficacy in preventing all infection nor did they assess efficacy in the prevention of transmission. Those terms were often cited, including by health authorities, ambiguously without definition. For example, in November 2020, Pfizer announced, "[p]rimary efficacy analysis demonstrates BNT162b2 to be 95% effective against COVID-19 beginning 28 days after the first dose."[84] This did not, however, report the absolute risk reduction of its COVID-19 vaccine, which was just 0.84%.[85] The absence of absolute risk reduction disclaimer can lead to misleading efficacy claims, as relative risk reduction exaggerates

---

[83] *See* Brown et. al, *Outcome Reporting Bias in COVID-19 mRNA Vaccine Clinical Trials,* PubMed (February 2021), available at https://pmc.ncbi.nlm.nih.gov/articles/PMC7996517/pdf/medicina-57-00199.pdf

[84] *See* Pfizer Release, *Pfizer and BioNTech Conclude Phase 3 Study of COVID-19 Vaccine Candidate, Meeting All Primary Efficacy Endpoints*, Pfizer, Nov. 18, 2020, available at https://www.pfizer.com/news/press-release/press-release-detail/pfizer-and-biontech-conclude-phase-3-study-covid-19-vaccine

[85] *See* Piero Olliaro et al., *COVID-19 vaccine efficacy and effectiveness—the elephant (not) in the room*, 2 LANCET e279, 279 (July 2021), available at https://www.thelancet.com/journals/lanmic/article/PIIS2666-5247(21)00069-0/fulltext

perceived efficacy when baseline risk is low.[86] In other words, when one claims that a vaccine is "95% effective, that certainly does not mean that the vaccine is 95% effective at preventing infection and transmission. The COVID-19 vaccines were often referred to in terms of relative risk reduction.

b. And real world data and publicly available research in the relevant timeframe demonstrated that the COVID-19 vaccines were not meaningfully effective at preventing infection and transmission of the virus. For example, an October 2021 study published in the Lancet—a highly reputable journal—confirmed that COVID-19 vaccines were incapable of stopping transmission of COVID-19 and, in fact, the transmission rate within the vaccinated cohort in that study was greater than the transmission rate for the unvaccinated cohort.[87] Moreover, the CDC validated that the COVID-19 vaccines were entirely incapable of preventing infection and transmission and that when infected, vaccinated individuals possessed similarly high viral loads as unvaccinated persons.[88] Thus, to the extent Dr. Salmon is opining the available scientific literature supported Mr. Secker's termination without accommodation, I disagree that the "most accurate estimates of the efficacy of COVID-19 vaccines at the time were based on the information available from the phase 3 clinical trials that were consider by the Food and Drug Administration (FDA) and its Vaccines and Related Biological Product Advisory Committee (VRBPAC) which were made available to the public." There was publicly available information at the time

---

[86] *See* Brown et. al, *Outcome Reporting Bias in COVID-19 mRNA Vaccine Clinical Trials,* PubMed (February 2021), available at https://pmc.ncbi.nlm.nih.gov/articles/PMC7996517/pdf/medicina-57-00199.pdf

[87] *See* Singanayagam et al., Community transmission and viral load kinetics of the SARS-CoV-2 delta (B.1.617.2) variant in vaccinated and unvaccinated individuals in the UK: a prospective, longitudinal, cohort study, The Lancet (Oct. 29, 2021), available at https://www.thelancet.com/journals/laninf/article/PIIS1473-3099(21)00648-4/fulltext.

[88] *See* Exhibit 3.

supporting that alternatives to vaccination could have and should have been deployed in Mr. Secker's situation, regardless of whatever FDA data was available.

c.     The emergence of COVID-19 variants further exposed the lack of efficacy of the vaccines in reducing COVID-19 rates of infection, and transmission. As the SARS-Cov-2 virus mutated and as new viral variants emerged, the virus' ability to undergo "immunological escape" increased thereby making the vaccines progressively less efficacious compared to when they were first made available (December 2020, the first case of the "Alpha" variant in the US was identified, and in January 2021, "Beta" and "Gamma" variants were also detected in the US. The "Delta" variant was shown to be the dominant variant in the United States in 2021, and by late November/early December 2021, the "Omicron" variant emerged as the dominant variant).

d.     The COVID-19 vaccines were tested and authorized when the Alpha variant was dominant, and the vaccines obviously were not tested against preventing transmission of subsequent variant strains of COVID-19. With the emergence of the Delta variant in the Summer of 2021, and the Omicron variant in the Fall/Winter of 2021, it became abundantly clear that any claimed vaccine efficacy against prevention of infection and transmission was unsupportable.[89]

e.     There are two fundamental factors that contributed to the lack of efficacy of the COVID-19 vaccines (and provide further support for accommodating Mr. Secker via vaccination alternatives, and against terminating Mr. Secker). The first factor was simple waning of antibody levels following vaccination. This phenomenon is well known to occur with all vaccines, but when a new vaccine is first introduced, the rate of decay or waning of antibody levels is unknown. The

---

[89] *See* Chemaitelly, et. al., NEW ENGLAND JOURNAL OF MEDICINE, *Waning of BNT162b2 Vaccine Protection against SARS-CoV-2 Infection in Qatar* (Dec. 2021) (concluding vaccine induced protection against SARS-CoV-2 infection waned rapidly, but protection against hospitalization and death persisted at for 6 months after the second dose).

second factor that specifically contributed to reductions in observed vaccine efficacy in the case of COVID-19, had to do with the extraordinarily rapid rate of pandemic virus mutation, and emergence of new viral variants of the SARS –CoV-2 virus.   Ramesh and colleagues (Ramesh et al, 2021) document in a very thorough manner the emergence of multiple SARS-CoV-2 variants during 2020 and 2021, and they also review the implications of the emergence of these viral variants on vaccine efficacy.[90]   These authors document that the CDC had classified pandemic viruses into variants of interest, variants of concern and variants of high consequence. At the time of the Ramesh publication, there were four variants of concern, and at least three variants of interest characterized.[91]   Ramesh and colleagues document the timelines of emergence of these variants, and also present in tabular form the important point that vaccine efficacy was observed to be progressively lower with the emergence of each new viral strain or variant.[92] It must be pointed out also that vaccine efficacy was unknown for various periods of time when these new viral subtypes first emerged, and before any vaccine efficacy assessments could be conducted.   Ramesh and his co-authors conclude in their paper "to date, studies indicate that the effectiveness of the currently available vaccines may be reduced against SARS-CoV-2 variants."[93]   The various vaccines and their clinical efficacy against the variants of concern are described and briefly summarized in Table 5 of the paper, and lower vaccine efficacy levels are seen with each novel variant over the timelines of their respective appearance.[94]

---

[90] *See* Ramesh et. al, Vaccines, Emerging SARS-CoV-2 Variants: A Review of Its Mutations, Its Implications and Vaccine Efficacy (Oct. 18, 2021).

[91] *Id*.

[92] *Id*.

[93] *Id*.

[94] *Id*.

Considering the foregoing, it was well-known through publicly available scientific literature and highly credible sources during the relevant period that the COVID-19 vaccines were incapable of preventing infection and transmission and infection, weighing heavily against arguments that there were no similarly, or more, effective countermeasures than vaccination.

48.    **Issue Addressed by Dr. Salmon: During the Relevant Time Period, was there any support that being vaccinated against COVID-19 could actually increase transmission?**

**Dr. Salmon Opinion:** "As previously discussed, COVID-19 vaccines cannot cause COVID-19. Additionally, by November 2021, it had been shown that vaccination reduced viral shedding and consequently reduced the likelihood of disease transmission." Salmon Report, at 18.

**Response:**

a.    While vaccination itself did not "increase" transmissibility of COVID-19 in and of itself, vaccination, along with the abandonment of other enhanced safety protocols, could realistically heighten the risk for asymptomatic transmission did have the effect of increasing transmission and infection of COVID-19. *See* discussion of same, pp. 16-31 above.

49.    **Issue Addressed by Dr. Salmon: During the Relevant Time Period, was natural immunity a relevant factor Epic should have considered in deciding who was required to be vaccinated?**

**Dr. Salmon Opinion:**[95] "Several studies were available at that time that indicated an immune response to COVID-19 that lasted for at least a short time [fns. omitted] reduced the risk of reinfection, and infections provided some level of protection among Rhesus monkeys. However, good correlates of protection were not available. A correlate of protection is an "empirically defined, quantifiable immune parameters that determine the attainment of protection against a given pathogen". In other words, it was not known what sort or how strong an immune response

---

[95] For brevity, referenced footnotes have been omitted.

was necessary to protect from COVID-19, including but not limited to new variants that might emerge. So, it was measured that natural infection resulted in an immune response which lasted at least for months, it was not known if that immune response protected from COVID-19. Additionally, while there was some indication that infection reduced the risk of reinfection, there was not a good measure of how much it reduced reinfection nor for how long. A CDC study available in August of 2021 indicated that among previously infected persons, reinfection was about twice as high if not being fully vaccinated, leading CDC to recommend "To reduce their likelihood for future infection, all eligible persons should be offered COVID-19 vaccine, even those with previous SARS-CoV-2 infection."

**Responses:**

50.     Dr. Salmon recognizes the known scientific reality that natural immunity against COVID-19 affords a level of protection.  What Dr. Salmon fails to grapple with is the key inquiry in this case – the relative efficacy of natural immunity versus vaccine elicited immunity. Recognizing natural immunity was an additional option as an alternative to vaccination. An immunologically normal individual who has experienced prior COVID (i.e. natural SARS-CoV-2 virus infection), and recovered fully from it, is less likely to spread COVID-19 than a person who lacks natural immunity, including a person who lacks natural immunity but has been vaccinated. *See* pp. 25-30 above for fuller discussion of natural immunity. And again, natural immunity has the additional benefit of providing personal protection against severe outcomes for the individual. Naturally acquired immunity can be assumed in a person with a well-documented/medically validated history of rapid antigen positive or PCR test positive COVID-19 and can also be demonstrated empirically by way of serum antibody testing.[96]  In the context of COVID-19,

---

[96] There is no indication in either Drs. Salmon's or Gerhart's expert Reports that Defendant required

natural immunity's desirable relative efficacy has been repeatedly confirmed in the scientific literature and by reputable sources.[97] Sound and reliable research demonstrates that natural immunity is superior to vaccine-elicited immunity.[98] Vaccine-based immunity merely mimics the pathways of natural immunity. In the context of COVID-19 and other mucosal respiratory viruses, mucosal immune responses occur with natural infection whereas they do not with a parenterally administered vaccine injection.  Further, the CDC has documented in its Morbidity and Mortality Weekly Report that natural immunity provides strong and durable protection against COVID-19.[99] In fact, the CDC confirmed instances covering the relevant period that individuals with natural immunity exhibited greater protection against viral variants than vaccinated individuals.[100]

As detailed above, any protection afforded by the COVID-19 vaccines rapidly wanes over time, which is why the CDC recommends a series of booster injections. But, importantly, we know that waning immunity over time is due not only to natural declines in antibody levels, but also to rapid antigenic changes in the virus that causes COVID-19.  Boosters may help with the former concern, but presumably do not help with the latter unless the booster vaccines specifically reflect

___

vaccinated employees to demonstrate proof of an antibody response derived from vaccination.

[97] *See, e.g.,* THE LANCET, *Past SARS-CoV-2 infection protection against re-infection: a systematic review and meta-analysis* (Feb. 16, 2023), *available at* https://www.thelancet.com/article/S0140-6736(22)02465-5/fulltext.; *see also* Pubmed, *Quantifying the risk of SARS-CoV-2 reinfection over time,* (May 27, 2021), Murcho et. al, available at https://pubmed.ncbi.nlm.nih.gov/34043841/; Journal of Clinical Infectious Diseases, *Necessity of COVID-19 vaccination in previously infected individuals,* (June 5, 2021), Shrstha, et. al, available at https://www.medrxiv.org/content/10.1101/2021.06.01.21258176v2; World Health Organization, "COVID-19 natural immunity", May 10, 2021, available at https://iris.who.int/bitstream/handle/10665/341241/WHO-2019-nCoV-Sci-Brief-Natural-immunity-2021.1-eng.pdf?sequence=3&isAllowed=7.

[98] *See, e.g.,* Plotkin's Vaccines, 7th Edition, at Section 2.

[99] *See, e.g.,* CDC MORBIDITY AND MORTALITY WEEKLY REPORT, Jan. 19, 2022, *COVID-19 Cases and Hospitalizations by COVID-19 Vaccination Status and Previous COVID-19 Diagnosis – California and New York, May-November 2021, available at* https://www.cdc.gov/media/releases/2022/s0120-covid-19-cases.html.

[100] *See id.* ("By early October [2021], persons who survived a previous infection [and therefore possessed natural immunity] had lower case rates than persons who were vaccinated alone.").

the molecular changes occurring in the new viral variant(s) in circulation.

Pfizer's COVID-19 vaccine trial documentation demonstrated the strength of natural immunity against COVID-19. In that trial, of 567 patients in the placebo group who had evidence of prior COVID-19 infection, only one developed reinfection. [101]   In contrast, there were 162 infections out of 16,944 placebo recipients with no evidence of prior COVID-19 infection. In other words, those with prior infection had at least a 100-fold lower rate of reinfection than those with no prior infection during the Pfizer trial period.

Considering these factors, a very important consideration in this case is whether natural immunity could have been recognized in lieu of vaccination as an accommodation option, and its relative efficacy compared to vaccine elicited immunity. This would require an examination of the relative benefits regarding the degree to which natural immunity following infection (as opposed to immunity conferred via vaccination) provides protection against re-infection.  By the time Defendant terminated Mr. Secker, the strength of natural immunity as protection against COVID-19 had been well established in reliable literature. *See* full discussion above, pp. 25-30.

Accordingly, considering the foregoing, allowing employees to submit proof of natural immunity against COVID-19 would present not only a sensible alternative to vaccination to those with religious reasons precluding vaccination, natural immunity is also a superior COVID-19 countermeasure than vaccination alone.

## IX.    SUMMARY AND CONCLUSION

To summarize, I dispute Drs. Salmon's and Gerhart's conclusions on the basis that they overstate the efficacy of COVID-19 vaccines on multiple levels, and understate the effectiveness

---

[101] FDA - *Vaccines and Related Biological Products Advisory Committee December 10, 2020 Meeting Briefing Document*, *available at* https://www.fda.gov/media/144245/download (Table 8, page 27).

and utility of non-vaccination infection control measures. Both vaccination and non-vaccination infection control interventions are imperfect. Neither are infallible. The respective effectiveness and utility of all infection control interventions is relative, not absolute.

Importantly, despite Defendant's experts blurring of the facts, Plaintiff was not a traditional "healthcare worker" and as I understand the situation, he did not come in any direct and/or regular contact with patients or the public. As such, it is disingenuous to imply that HCW recommendations and protocols must apply to him, and that there were not alternatives to vaccination. And while it may be permissible for an employer to mandate rigidly that all employees are required to undergo vaccination, permissibility does not imply reasonableness; just because an employer legally *can* impose a simplistic one-size-fits-all vaccination policy for its workers, this does not mean it *should* do so; and it does not mean that other measures, considered on a case-by-case basis, should not be undertaken, particularly where an employee has religious objections to vaccination.

Based on the available science and clinical data, during the relevant timeframes exceptions to vaccination mandates should exist, particularly where, as here, an employee cannot be vaccinated for religious reasons.

It is my opinion that an individual in Mr. Secker's job role observing one or more of the alternative COVID-19 countermeasures described throughout this Rebuttal Report posed an equal or lesser risk of being infected or transmitting COVID-19 than an individual who was vaccinated alone. And if these countermeasures are stacked on top of each other and simultaneously observed, an unvaccinated individual observing these safety measures posed a considerably lesser transmission risk than an individual who was vaccinated and not observing these same countermeasures.

Date: August 8, 2025

*Jeffrey J. Stoddard, M.D.*
JEFFREY J. STODDARD, M.D.

08/08/2025

Jeffrey Stoddard (Aug 8, 2025 16:17:38 CDT)